## WILLIAM B. GEERY v. MINNESOTA TAX COMMISSION AND OTHERS.[1]

March 30, 1938.

No. 31,384.

[1]Reported in 278 N. W. 594.

*William S. Ervin,* Attorney General, and *William D. Gunn,* Special Assistant Attorney General, for appellants.

*Ueland & Ueland,* for respondent.

LORING, JUSTICE.

This case comes to the writer on reassignment. It is a suit to recover income tax paid to the state of Minnesota under protest for the year 1933. The tax commission demurred to the complaint, and the trial court overruled the demurrer but certified that the question was important and doubtful. This appeal followed.

During the year 1933 the plaintiff was governor of the Federal Reserve Bank of Minneapolis. He filed a return for the year 1933 with the tax commission under the provisions of the Minnesota income tax law, which is L. 1933, c. 405, 3· Mason Minn. St. 1936 Supp. §§ 2394-1 to 2394-58. In his return he disclosed the amount of salary paid him by the bank but asserted that the salary was exempt. The tax commission took the position that it was not exempt and assessed the plaintiff in the sum of $540.43 for income tax thereon. He paid that amount under protest and filed a claim for refund, which was denied. As authorized by § 47 of the act, this suit followed. In 1933 the income tax was light, but it has since been increased to one of the heaviest if not the heaviest of the state income taxes.

The principal and most important question presented by this appeal is whether or not the tax upon the plaintiff's salary is an exaction laid directly upon the means or instrumentalities which the United States government has chosen for executing its sovereign powers. The federal sovereignty has an immunity from state taxa-

tion based upon its implied constitutional right to carry on its lawful operations free from burdens and impediments imposed by the states.

"The immunity is derived from the Constitution in the same sense and upon the same principle that it would be if expressed in so many words." Clallum County v. United States, 263 U. S. 341, 344, 44 S. Ct. 121, 122, 68 L. ed. 328.

It springs from the necessity of maintaining our dual system of government.

"Where the principle applies it is not affected by the amount of the particular tax or the extent of the resulting interference, but is absolute. * * * Of course, the reasons underlying the principle mark the limits of its range." Indian Motocycle Co. v. United States, 283 U. S. 570, 575, 51 S. Ct. 601, 603, 75 L. ed. 1277, 1281, and cases cited.

The answer to the question here presented lies wholly within the realm of federal jurisprudence, because freedom from the burden of such exactions arises by implication from the express powers conferred by the national constitution upon the federal government. Therefore, the decisions of the United States Supreme Court are binding upon the states, and we must follow the law as laid down by that court.

In M'Culloch v. Maryland, 4 Wheat. 316, 429, *et seq.*, 4 L. ed. 579, the Supreme Court speaking through Mr. Chief Justice Marshall said:

"All subjects over which the sovereign power of a state extends, are objects of taxation; but those over which it does not extend, are, upon the soundest principles, exempt from taxation. * * *

"The sovereignty of a state extends to every thing which exists by its own authority, or is introduced by its permission; but does it extend to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States? We think it demonstrable that it does not. Those powers are not given by the people of a single state. They are given by

the people of the United States, to a government whose laws, made in pursuance of the constitution, are declared to be supreme. Consequently, the people of a single state cannot confer a sovereignty which will extend over them.

"If we measure the power of taxation residing in a state, by the extent of sovereignty which the people of a single state possess, and can confer on its government, we have an intelligible standard, applicable to every case to which the power may be applied. We have a principle which leaves the power of taxing the people and property of a state unimpaired; which leaves to a state the command of all its resources, and which places beyond its reach, all those powers which are conferred by the people of the United States on the government of the Union, and all those means which are given for the purpose of carrying those powers into execution. We have a principle which is safe for the states, and safe for the Union. * * * *We are not driven to the perplexing inquiry, so unfit for the judicial department, what degree of taxation is the legitimate use, and what degree may amount to the abuse of the power.* The attempt to use it on the means employed by the government of the Union, in pursuance of the constitution, is itself an abuse, because it is the usurpation of a power which the people of a single state cannot give.

"We find, then, on just theory, a total failure of this original right to tax the means employed by the government of the Union, for the execution of its powers." (Italics ours.)

The rule is well settled that the government may employ a corporation as its agency or instrumentality for the execution of its powers, and a state is without authority to tax the instruments, or compensation of persons, which the United States may use and employ as necessary and proper means to execute its sovereign power. New York ex rel. Rogers v. Graves, 299 U. S. 401, 57 S. Ct. 269, 81 L. ed. 306, 311; Dobbins v. Commrs. of Erie County, 16 Pet. 435, 448, 10 L. ed. 1022, 1027. The immunity from state taxation upon the means, the operations, and the instruments of the federal government is just as firmly established as is the immunity of the

government's property itself. The immunity of the exertion of state sovereignty, including salaries of officers procured and retained in the exercise of such sovereignty, is likewise firmly established. Brush v. Commr. of Internal Revenue, 300 U. S. 352, 57 S. Ct. 495, 81 L. ed. 691, 108 A. L. R. 1428. The most important aspect of the question here presented is whether or not the functions and the purposes served by a federal reserve bank are of such a character that the governor (now called the president) of that bank may be said to be employed as a necessary and proper means of executing the sovereign power of the United States.

In Taber v. Indian Territory I. O. Co. 300 U. S. 1, 3, 57 S. Ct. 334, 335, 81 L. ed. 463, the Supreme Court said:

"Our decisions distinguish between a nondiscriminatory tax upon the property of an agent of government and one which imposes a direct burden upon the exertion of governmental powers. In the former case where there is only a remote, if any, influence upon the exercise of governmental functions, we have held that a nondiscriminatory *ad valorem* tax is valid, although the property is used in the operations of the governmental agency."

As illustrations of the class first mentioned the court cited Alward v. Johnson, 282 U. S. 509, 514, 51 S. Ct. 273, 274, 75 L. ed. 496, 500, 75 A. L. R. 9, where a tax based upon gross receipts in lieu of all other taxes, was sustained upon the operator of a stage line between points in California, where a government mail contract was the principal source of revenue; and Tirrell v. Johnston, 293 U. S. 533, 55 S. Ct. 238, 79 L. ed. 641, where a "gasoline road toll" tax was sustained as applied to a rural mail carrier.

In James v. Dravo Contracting Co. 302 U. S. 134, 58 S. Ct. 208, 219, 82 L. ed. —, the Supreme Court's latest decision on the subject, an occupation tax measured by gross income imposed by a state upon a contractor with the United States was held not to be invalid as laying a direct burden on the federal government, even though the imposition of the tax might increase the cost to the government of the work contracted to be done. Here, admittedly, the contractor was neither an agency or instrumentality of the United States in its

sovereign capacity. The majority of the court commenting upon Metcalf & Eddy v. Mitchell, 269 U. S. 514, 523, 524, 46 S. Ct. 172, 174, 70 L. ed. 384, 392, 393, said [302 U. S. 157]:

"We said further that the nature of the governmental agencies or the mode of their constitution could not be disregarded in passing on the question of tax exemption, as it was obvious that an agency might be of such a character or so intimately connected with the exercise of a power or the performance of a duty by the one government, 'that any taxation of it by the other would be such a direct interference with the functions of government itself as to be plainly beyond the taxing power.' And it was on that principle that, 'any taxation by one government of the salary of an officer of the other, or the public securities of the other, or an agency created and controlled by the other, exclusively to enable it to perform a governmental function,' was prohibited."

On the other hand, in New York ex rel. Rogers v. Graves, 299 U. S. 401, 57 S. Ct. 269, 270, 81 L. ed. 306, it was held that the Panama Railroad Company was a federal instrumentality employed by the United States in the exercise of its sovereignty for purposes of national defense and for the promotion of commerce, and that consequently fixed compensation paid to its officers in their capacity as such was immune from state taxation. It is true that all the stock of the railroad company except the qualifying shares for the directors was owned by the United States government, but the case did not turn on government ownership. The state of New York contended, and the appellate division of the supreme court of that state held, that the railroad company was a government-controlled corporate agency engaged in a commercial proprietary function and was not immune from state taxation. The court of appeals of New York affirmed the decision of the appellate division without opinion. The Supreme Court of the United States stated [299 U. S. 404]:

"The question, therefore, to be answered is whether the canal is such an instrumentality of the federal government as to be immune from state taxation; and, if so, are the operations of the railroad

company so connected with the canal as to confer upon the company a like immunity?"

It was then held that the operation of the canal was an exercise of the government's sovereign functions and that consequently all auxiliaries primarily designed and used to aid in its management and operations and which had that effect partook of the nature and purposes of the principal enterprise. It was there shown that the railroad company used both its ships and railroad to carry private freight and passengers. In commenting upon this feature of the case the court said [299 U. S. 407]:

"The record shows that this is done to a limited extent compared with the government business; and that it is only incidental to the governmental operations. The primary purpose of the enterprise being legitimately governmental, its incidental use for private purposes affords no ground for objection. United States v. Chandler-Dunbar Water Power Co. 229 U. S. 53, 73, 33 S. Ct. 667, 57 L. ed. 1063, 1079; Ashwander v. Tennessee Valley Authority, 297 U. S. 288, 333, 56 S. Ct. 466, 476, 80 L. ed. 688, 703."

Nor did it alter the situation that the railroad company operated a dairy, a hotel, and other enterprises. The court further said [299 U. S. 408]:

"The power of the federal government to use a corporation as a means to carry into effect the substantive powers granted by the Constitution has never been doubted since M'Culloch v. Maryland, 4 Wheat. 316, 4 L. ed. 579. The Panama Railroad Company was acquired and has been utilized in virtue of that power. The railroad company being immune from state taxation, it necessarily results that fixed salaries and compensations paid to its officers and employees in their capacity as such are likewise immune.

"In Dobbins v. Commrs. of Erie County, 16 Pet. 435, 448, 449, 10 L. ed. 1022, 1027, this court held that a state was without authority to tax the instruments, or compensation of persons, which the United States may use and employ as necessary and proper means to execute its sovereign power."

It will thus be seen that the functions of the corporation, and not the title to its stock, were the determining factors in the decision.

What, then, were the purposes of the government in establishing the federal reserve banks? And were those purposes an exertion of its sovereign functions? In Raichle v. Federal Reserve Bank, 34 F. (2d) 910, 67 A. L. R. 1167, the circuit court of appeals of the second circuit reviewed at some length the legislation in this country leading up to the federal reserve act (12 USCA, § 221, *et seq.*). We need not quote from that opinion, but comment was there made on the inadequacy of the national banking system as a central regulating force for protection against undue expansion or contraction of credit, or for the controlling of interest rates, or for preventing or lessening financial stringencies or panics. The committee report transmitting the bill to the senate stated the object of the federal reserve act to be the establishment of a more uniform rate of discount throughout the United States; to prevent the over-expansion or contraction of credit; to effectuate the general economy of reserves so as to make them available in any section of the country and thus to prevent the suspension of payments by banks; the furnishing of an elastic currency by the abolition of the existing bond-secured note-issue in whole or in part, and the substitution of a freely issued and adequately protected system of bank notes, which should be available to all institutions which had the proper class of paper for presentation; and the commercial use of funds of the government then isolated in the treasury and subtreasuries, as well as a general supervision of the banking business and the creation of a market for commercial paper.

The title of the federal reserve act was, "An act to provide for the establishment of Federal reserve banks, to furnish an elastic currency, to afford means of rediscounting commercial paper, to establish a more effective supervision of banking in the United States, and for other purposes." 38 St. 251. At the head of the federal reserve system was the federal reserve board, now designated as the "Board of Governors of the Federal Reserve System." That board exercises supervision and control over the 12 federal reserve banks in the districts into which the United States is divided. The

ninth federal reserve district includes all of the states of Montana, North Dakota, South Dakota, Minnesota, and part of the states of Michigan and Wisconsin, with the federal reserve bank located at Minneapolis. Each of these reserve banks has a board of nine directors, three chosen from the member banks, three chosen by the member banks to represent industry, and three designated by the federal reserve board, one of the last three being designated the federal reserve agent. Under the provisions of the act all national banks in the district are required to subscribe to the capital of the reserve bank to the extent of six per cent of their own capital and surplus. State banks which voluntarily become members of the system are required to make a like contribution to the capital. Private parties are allowed to purchase "public stock" in amounts less than $25,000. Upon its shares cumulative annual dividends of six per cent are to be paid after all necessary expenses of the bank have been paid or provided for. It was originally provided in the act that after the dividends had been fully met all of the net earnings should be paid to the United States as a franchise tax, except that one-half of such net earnings should be paid into a surplus fund until it amounted to 40 per cent of the paid-in capital of the bank. This provision was subsequently changed to provide that all net earnings above the six per cent dividends should be paid into the surplus fund of the bank. Upon liquidation, any surplus remaining after the payment of all debts, dividend requirements, and the par value of the stock must be paid to, and becomes the property of, the United States. The government takes the profit, if any.

These federal reserve banks are not empowered to enter the field of general banking. They exercise only such functions as congress has specifically imposed upon them. They accept no deposits from, and normally make no loans to, individuals or corporations, but act as depositories for the reserves of their member banks, and the percentage of the deposit liability required of the member banks is fixed within statutory limits by the federal reserve board. They receive the deposits of, and make loans to and discounts for, their member banks under restrictions defined by the federal reserve

board, and the interest rate charged for such loans and discounts is subject to review by that board. (12 USCA, § 342.) In "unusual and exigent circumstances" they may with the permission of the board and upon restricted security make loans to individuals and corporations if such loans cannot be obtained elsewhere (§ 343), and in ordinary times they may make loans to private business on the security of governmental obligations only (§ 347). They also act as depositories and fiscal agents for the government and many of its relief corporations and handle the distribution of government bonds, the payment of government checks, and the redemption of bonds and coupons. The major share of currency in circulation in this country is in the form of federal reserve bank notes, which are obligations of the United States and the quantity of which is within the control of the federal reserve board.

From the foregoing it will be seen that these banks are privileged to enter the general banking field in a very limited way and merely incidentally to their paramount function, which appears to be the furnishing of an elastic currency and the control of credit. Most of the duties imposed upon the federal reserve banks could have been performed by the creation of subtreasuries or by a single central reserve bank, as was at first proposed, but congress in its wisdom preferred to requisition the capital on what was practically a preferred stock basis and to create a system decentralized to the extent of dividing its activities into the 12 districts but under completely centralized control, and so coördinated as to function smoothly for what appears to us to have been the main purpose of controlling the expansion and contraction of the currency and credit, in order to avoid panics and unwarranted booms, and thus to provide for the general welfare and the promotion of commerce, credit and currency being the very life blood of the commercial and financial structure of the country. There is very little of the duty imposed upon the reserve banks which could be said to be banking in its strictly private nature, and therefore that feature of their activities comes within the rule announced in the Panama Railroad case, in which such incidental activities were not regarded

as affecting the immunity attaching in consequence of the paramount sovereign functions. There is nothing in the record or in the law which indicates that as governor plaintiff's activities were confined to the incidental private functions. On the other hand, we may presume that he, as chief executive, was engaged in the discharge of the paramount activities of the bank, which are peculiarly and essentially sovereign in character. There is no indication in the law that the federal reserve agent alone is charged with these sovereign activities.

Congress itself seems to have regarded the federal reserve system as an exertion of its sovereign power, for it permits by statute a nondiscriminatory tax upon the shares of the national banks, which, under governmental supervision, together with the state banks, serve the ordinary necessities of private commerce as distinguished from the sovereign purposes of regulation and control, whereas, "Federal reserve banks, including the capital stock and surplus therein, and the income derived therefrom" are, except real estate, specifically exempted from taxation by either the federal government or the state. This is a declaration that the functions of the bank are regarded by congress as an exercise of sovereign power. It might not otherwise invoke its right to exemption. Such a declaration may not be binding on the courts but is entitled to great weight and should not be lightly disregarded. Such being the case, we think that the federal reserve system, including the federal reserve banks, is an exertion of the sovereign powers of the federal government. If there were but one federal reserve bank for the entire country instead of 12 such banks, the character of its functions might appear to be more conspicuously sovereign than the decentralized system, but the difference would be a matter of appearance only. Those banks cannot function except through the employment of officers who give "use and efficacy to the whole" and whose duties are essential and peculiar to the sovereign functions of the banks. Dobbins v. Commrs. of Erie County, 16 Pet. 435, 448, 10 L. ed. 1022. Such duties "have no analogue" in the field of private banking. Brush v. Commr. of Internal Revenue, 300 U. S. 352, 378, 57 S. Ct. 495, 503, 81 L. ed. 691, 108 A. L. R. 1428. His

salary is the means by which plaintiff's "services are procured and retained." (16 Pet. 435, 448.) A tax on it appears to be a palpable and direct burden on the exertion of the sovereign functions of the United States. Due to the placing of the reserve bank in Minneapolis, the plaintiff resided in Minnesota to discharge the duties imposed upon him, which duties relate to the sovereign powers of the government as exerted in a number of states. If there is no immunity he becomes subject to the heavy exactions of our income tax. We think, therefore, that the salary is exempt from a state income tax under the implied constitutional immunity. New York ex rel. Rogers v. Graves, 299 U. S. 401, 57 S. Ct. 269, 81 L. ed. 306; Brush v. Commr. of Internal Revenue, 300 U. S. 352, 57 S. Ct. 495, 81 L. ed. 691, 108 A. L. R. 1428. In James v. Dravo Contracting Co. 302 U. S. 134, 58 S. Ct. 208, 82 L. ed. —, it was suggested to the court that a state tax should be sustained though it lays a burden on the sovereignty of the United States if the burden be but a normal nondiscriminatory tax and not a burden that the United States could not bear. We do not understand the majority opinion in the James case as going so far, or that it could go so far without overruling M'Culloch v. Maryland, 4 Wheat. 316, and all the cases following it. James v. Dravo Contracting Co. seems to recognize that functions of a federal instrumentality may be so intimately connected with the exercise of the sovereign powers that any tax whatever would be a direct interference and consequently invalid. Such appears to be the situation here. If the principle of immunity against only abnormal or discriminatory tax burdens is to be adopted, the states must be prepared to accept the same doctrine with reference to federal taxation on the exertion of sovereign state functions. To us it appears that the solution lies not in the judicial overruling of the principle of implied immunity, but in some reciprocal arrangement by legislative consent for nondiscriminatory taxation, which involves no sacrifice of fundamental sovereign rights or menace to our dual sovereignty.

We do not rest our decision on the interpretation of § 12(g) of the Minnesota income tax act, because as we interpret that section it confers immunity only so far as the immunity extends by impli-

cation under the constitution of the United States. In short, it adopts the law as laid down by the Supreme Court of the United States in M'Culloch v. Maryland, 4 Wheat. 316, and subsequent cases as the measure of immunity from the state tax.

Affirmed.

STONE, JUSTICE (dissenting).

The purpose of our income tax is to make the payers contribute to the support of government in proportion to their ability to pay. Strictly speaking, the tax is on the person rather than his income. The latter is but the measure of his obligation. Because of that, and inasmuch as property and income as such have no rights, the question of immunity from an income tax must be solved by consideration of the rights of the taxpayer. That some of the latter are his because attached *in rem* to his property or income may affect the result. But it does not make less determinative his own legal status in respect to any tax sought to be imposed on him.

Solution of the problem of immunity in a given case is likely to be wrong if it is forgotten that we are dealing with a personal tax rather than one on property. For that and other reasons, what may be called the economic argument should be put aside. Our property taxes are high. *Pro tanto,* they burden all officers and employes of the United States and its instrumentalities, whom we are fortunate enough to have as residents of our state, in the same manner, and just as directly, as does the income tax.

Officers of the federal reserve bank are not officers of the United States. At most they serve only a governmental instrumentality, which is not even partially owned by the government. Their compensation is not paid by government or out of government funds. (That circumstance is well-nigh determinative. See Helvering v. Therrell, 303 U. S. 218, 58 S. Ct. 539, 82 L. ed. —.) There is then no impingement upon federal jurisdiction by subjecting them personally to the payment of a nondiscriminatory state income tax measured by their income inclusive of their compensation as bankers. The state tax sustained in Union Pacific R. Co. v. Peniston, 18 Wall. 5, 36, 21 L. ed. 787, seems to me to have been

nearer an invasion of the federal field than the one presently involved. That decision declared the test to be "the effect of the tax"; that is, "whether the tax does in truth deprive them [instrumentalities of the federal government] of power to serve the government as they were intended to serve it, or hinder the efficient exercise of their power."

The Supreme Court of the United States has "always recognized that no constitutional implications prohibit a nondiscriminatory tax upon the property of an agent of government merely because it is the property of such an agent and used in the conduct of the agent's operations and necessary for the agency." Helvering v. Mountain Producers Corp. 303 U. S. 376, 58 S. Ct. 623, 627, 82 L. ed. —.

That proposition should have the same application to taxes *in personam* as it has to those *in rem*.

I fail to perceive how the tests thus established are violated by Minnesota's income tax in application to the officers and employes of the federal reserve bank of Minneapolis. Just how is the mechanism of that institution to be jammed or its operation slowed because those in charge are required to contribute to the support of the state government in precisely the same fashion and by the same standard as other residents (*e. g.*, bankers) similarly circumstanced?

GALLAGHER, CHIEF JUSTICE (dissenting).

I agree with Mr. Justice Stone that the case should be reversed. It is very evident that with the ever-increasing establishment of state and federal agencies it has become necessary to devise a method either by constitutional amendment, by legislation, or by a more liberal interpretation of existing law whereby those favored with state employment may be required to contribute to the maintenance of governmental affairs and those favored with government employment may be required to contribute to the maintenance of state affairs, thereby relieving, in part, the burdens of their now less fortunate fellow citizens who contribute to the maintenance of

both. The method outlined by Mr. Justice Stone in his dissenting opinion suggests a theory whereby this may be done.

Aside, however, from the method so suggested, I agree with the contention of the state that, in the instant case, the tax attempted to be imposed is not a tax upon a federal reserve bank or a burden upon a governmental instrumentality, but rather a tax upon the salary of one employed by an agency furnishing service to the government. The federal reserve bank is not owned by the government. It is merely an agency or instrumentality which the government uses. The stock in the bank is owned by the member banks. While its functions are such that it aids the government, it also renders an appreciable service to its stockholders, the member banks, all private corporations. As governor of the federal reserve bank, Mr. Geery cannot be said to be an employe of the government, but rather an employe of an agency or instrumentality used by the government and rendering service, not only to the government, but to private corporations as well. As such, he is as much subject to the tax as are the officers and employes of the member banks and others upon whom its onerous burdens are imposed.

JULIUS J. OLSON, JUSTICE (concurring).

I am in complete accord with what Mr. Justice Loring has said in his opinion. To my mind, the decisive question is whether the tax here involved is sought to be imposed upon a nontaxable subject. If it is, then obviously the result reached by the trial court was right. What was said in Macallen Co. v. Massachusetts, 279 U. S. 620, 628, 49 S. Ct. 432, 434, 73 L. ed. 874, 65 A. L. R. 866, provides the answer, and I quote:

" '* * * the power to destroy which may be the consequence of taxation is a reason why the right to tax should be confined to subjects which may be lawfully embraced therein, even although it happens that in some particular instance no great harm may be caused by the exercise of the taxing authority as to a subject which is beyond its scope.' Not only may the power to tax be exercised oppressively, but for one government—state or national—to lay a tax upon the instrumentalities or securities of the other is deroga-

tory to the latter's dignity, subversive of its powers, and repugnant to its paramount authority."

If that was the law, as I think it was, when we enacted our income tax statute, such it must be now.

MR. JUSTICE PETERSON took no part in the consideration or decision of this case.