## 78-53  MEMORANDUM OPINION FOR THE SECRETARY OF LABOR

### Service Contract Act of 1965 (41 U.S.C. § 351 et. seq.) —Applicability to Federal Reserve Banks

The Attorney General has asked me to respond to your request of January 23, 1978, for an opinion on the question whether the Service Contract Act of 1965, 41 U.S.C. §§ 351-358, 79 Stat. 1034, as amended (Act), is applicable to the Federal Reserve banks. For the reasons hereafter set forth we conclude that the Federal Reserve banks are subject to the provisions of the Service Contract Act.*

Section 2 of the Act, as amended, 41 U.S.C. § 351, provides in substance that every contract entered into "by the United States" in excess of $2,500, the principal purpose of which is to "furnish services in the United States through the use of service employees," shall contain the following:

(1) A provision specifying the minimum wage to be paid to the various classes of service employees as determined by the Secretary of Labor, or in accordance with an applicable collective bargaining agreement,

(2) A provision specifying fringe benefits similarly determined, and

(3) A provision that no part of the services shall be performed in buildings or surroundings furnished by the contractor or subcontractor which are unsanitary or hazardous to the health or safety of the service employees.

In no case are the wages to be less than the minimum wages provided for by § 6 of the Fair Labor Standards Act, 29 U.S.C. § 206.

The term "service employee" is defined in § 8(b) of the Act, as amended, 41 U.S.C. § 357(b). It includes guards, watchmen, and persons employed in laundry, dry cleaning, custodial, janitorial, cafeteria, and miscellaneous housekeeping operations. See Rept. No. 798, 89th Cong., 1st sess. pp. 2, 3 (1965) (hereafter S. Report).

---

*The court in *Brink's Inc.* v. *Board of Governors, etc.*, 466 F. Supp. 116 (D.C. D.C. 1979), discussed this opinion and agreed with its conclusion.

211

The purpose of the Act is to provide "much needed labor standard protection for employees of contractors and subcontractors furnishing services to or performing maintenance service for Federal agencies"; at the time of its enactment "the service contract was the only remaining category of federal contracts to which no labor standard protections apply." H. Rept. No. 948, 89th Cong., 1st sess., p.1 (hereafter H. Report); *see also* S. Report, p.1. The perceived need for protection resulted from the fact that service employees frequently were not covered by the Fair Labor Standards Act and State minimum wage laws, and often were not members of unions. Consequently, they were "one of the most disadvantaged groups of our workers and little hope exists for improvement of their position without some positive action to raise their wage level." H. Report, p. 2; S. Report, p.3. Members of Congress had expressed their concern over the status of the employees of contractors having service contracts with the United States for several years prior to the adoption of the Act in 1965. H. Report, p.2. These concerns were epitomized by the statement on the floor of the House of Representatives by Representative O'Hara, who was in charge of the bill:

> . . . the purpose of this bill is to extend the long-standing policy of Congress that the Federal Government shall not be a party to the depressing of labor standards in any area of the Nation. [111 Cong. Rec. 24387 (1965)]

And Representative Burton pointed out:

> When a Government contract is awarded to a service contractor with low wage standards, the Government is, in effect, subsidizing subminimum wages. [111 Cong. Rec. 24388]

Your Department takes the position that in the light of the purpose and policy of the Act and the governmental functions exercised by the Federal Reserve banks, the latter are sufficiently identified with the United States so as to be embraced by the term "United States" in § 2 of the Act. The Federal Reserve banks contend otherwise on three grounds:

*First*, they assert that the banks, although possessing a hybrid character, are essentially private banking corporations and not Agencies of the United States; *second*, the Act does not apply to Agencies such as the Federal Reserve banks, which do not conduct their business through appropriated funds; and *third*, when statutes are intended to assimilate the Federal Reserve banks to the United States they do so expressly.

I.

It is generally recognized that the Federal Reserve banks do possess a hybrid character. While in some aspects their activities are like those of private banking corporations, they are under strict governmental control and perform important governmental functions. Although the United States does not own any part of their capital stock, which is subscribed to by their member banks, 12 U.S.C. § 284 note, and does not elect a majority of their boards of directors, 12 U.S.C. § 302, the stockholders' rights are strictly limited. Thus, the

212

directors elected by the stockholders are not eligible for the positions of chairman or vice chairman of boards of directors, 12 U.S.C. § 305; the stockholders are limited to a dividend of 6 percent, 12 U.S.C. § 289; in the event of liquidation any surplus goes to the United States and not to the stockholders. The banks are under the supervisory control of the Board of Governors of the Federal Reserve System. 12 U.S.C. § 248.[1] In addition, they perform important functions of a governmental nature, acting as fiscal agents of the United States pursuant to 12 U.S.C. § 391, and engaging in open "market operations" under the rules and regulations prescribed by the Board of Governors of the Federal Reserve System. 12 U.S.C. §§ 353-358. Indeed, as stated in *The Federal Reserve System, Purposes and Functions* (1974), a publication issued by the Governors of the Federal Reserve System, the important governmental operations of the Federal System are conducted through the 12 Federal Reserve banks; the Office of the Board of Governors in Washington, D.C., is a headquarters-type facility, and no ordinary operations of a banking character are conducted there. At p. 15. The mixed nature of the Federal Reserve banks is illustrated by 12 U.S.C. § 531, pursuant to which they are covered by the customary exemption of the Federal Government and its Agencies from State and local taxation except with regard to real estate taxes.

The courts have also recognized that the Federal Reserve banks perform important governmental functions, and hence have refused to treat them as private banks with respect to their governmental operations, *See, e.g., Raichle* v. *Federal Reserve Bank,* 34 F. (2d) 910 (2d Cir., 1929); *Federal Reserve Bank of Richmond* v. *Kalin,* 77 F. (2d) 50, 51 (4th Cir., 1935); *Schmoll, Inc.* v. *Federal Reserve Bank,* 286 N.Y. 503 (1941), or for the purpose of taxation. *E.G., Geery* v. *Minnesota Tax Commission,* 202 Minn. 366, 373-378 (1938);[2] *Federal Reserve Bank of Minneapolis* v. *Delta County Register of Deeds,* 288 Mich. 120 (1939). The Attorney General ruled that Federal Reserve banks are entitled to Government telegraph rates for their operation as fiscal agents of the Government. 33 Op. A.G. 54 (1921).

The recent decisions in *Federal Reserve Bank of Boston* v. *Commissioner of C. & T.,* 449 F. (2d) 60 (1st Cir., 1974); 520 F. (2d) 221 (1st Cir., 1975), are highly pertinent here. The issue in those cases was whether a Federal Reserve bank had a sufficiently governmental character to overcome the prohibition of 28 U.S.C. § 1341, pursuant to which the Federal "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."[3]

The court held that Federal Reserve banks "are plainly and predominantly

---

[1] For a more detailed analysis, *see* the quotation from *Federal Reserve Bank of Boston* v. *Commissioner of C.& T., infra.*

[2] *See* pages 373-375 for the careful analysis of the powers of the Federal Reserve banks.

[3] In *Department of Employment* v. *United States,* 385 U.S. 355, 358 (1966), the Supreme Court concluded ". . . in accord with an unbroken line of authority and convincing evidence of legislative purpose, that § 1341 does not act as a restriction upon suits by the United States to protect itself and its instrumentalities from unconstitutional exactions."

fiscal arms of the federal government," 499 F. (2d) 62, and therefore not subject to the statute. This was based on the following analysis of the structure and functions of the Federal Reserve banks:

> There are twelve such banks in the nation, of which the plaintiff is one. They were created and are operated in furtherance of the national fiscal policy. They are not operated for the profit of shareholders, and do not provide ordinary commercial banking services; their stockholders, the member banks, lack the powers and rights customarily vested in shareholders of a private corporation. Federal reserve banks act as depositories for money held in the United States Treasury and as fiscal and monetary agents of the United States. 12 U.S.C. § 391. They hold the legal reserves of member banks, issue currency, facilitate check clearance and collection and have supervisory duties as to member banks. They also provide important services for the Treasury with respect to the public debt and the issuance, handling and redemption of government securities. The limited income generated is used to pay expenses and dividends limited to 6 percent. Any remaining earnings are paid into the surplus fund, 12 U.S.C. § 289, where they may be used by the United States Treasury to supplement the gold reserve. Should a federal reserve bank go into liquidation, any surplus becomes the property of the United States, 12 U.S.C. § 290. *See generally* Board of Governors, *The Federal Reserve System: Purposes and Functions* (5th ed. 1969). [499 F. (2d) 62, 63]

Indeed, the court held that the interests of the Federal Reserve banks are "indistinguishable from those of the sovereign and there are good reasons to relieve them of any symbolic joinder with and by the United States," as would be required of Federal savings and loan associations. 499 F. (2d) 62.

At a later stage of the proceedings the court explained its earlier decision stating:

> We reversed, holding that a federal reserve bank belonged to the very narrow class of entities forming an integral part of the United States Government which were entitled to a federal forum even with respect to a state tax claim. [520 F. (2d) 223]

We believe that an entity so closely integrated with the Federal Government as to be able to litigate its exemption from State taxes in the Federal courts despite 28 U.S.C. § 1341, and to do so without the normal requirement of a joinder of the United States, should also be considered the United States for the purposes of a statute designed in the words of its sponsor, Congressman O'Hara, *supra.*, "that the Federal Government shall not be a party to the depressing of the labor standards in any area of the nation."

## II.

The Federal Reserve banks argue that the Service Contract Act is limited to Agencies operating with appropriated funds and therefore does not apply to

214

them because their funds are not derived from the Treasury of the United States. The Act does not provide any pertinent specific limitation to its coverage. The argument is based in part on passages in the legislative history of the Act to the effect that the United States Government should not subsidize substandard wages[4] and in part on a statement of the Solicitor of Labor before the Senate Committee on Labor and Public Welfare and a passage in the Senate report.

With respect to the subsidization point, we cannot perceive in those passages any intent to limit the scope of the Act to contracts financed by appropriated funds. The gist of the statutory purpose appears in the statement made by Congressman O'Hara that the United States should not be a *party* to the depressing of labor standards. Congress apparently was not concerned with the technical fiscal, and to some extent the fortuitous, question whether specific contracts were financed by appropriated or nonappropriated funds. If anything, as shown below, those legislators aware of the distinction between appropriated and nonappropriated funds believed that it was irrelevant to the purposes which the Act was designed to accomplish.

During the hearings on the Act before the Senate committee, Senator Javits asked the Solicitor of Labor whether the Act had the effect of closing all gaps in the statutes providing for labor standard protections to all employees of the Federal Government and its contractors.[5] The Solicitor explained that one group would still lack the badly needed protection, namely, those employees of the Federal Government who were paid out of nonappropriated funds, such as employees of the Post Exchanges. At that time they were not covered by any wage standards legislation, and, as *direct* employees of the Federal Government, would not be entitled to the benefit of the Act, which is limited to employees of Government contractors.[6] When Senator Javits suggested that thought be given to the protection of direct Government employees paid from nonappropriated funds, apparently by broadening the scope of the Act, he replied that this goal could be achieved by administrative action.

The Senate report referred (at pp. 2-3) to the failure of the Act and of related legislation to cover certain direct service employees of the Department of Defense and "strongly urged that the appropriate directive be issued by the Department of Defense or any other appropriate Federal Agency to give such service employees the coverage provided for by the bill."

The above legislative discussion does not support the proposition that the Act does not extend to the employees of contractors with the Government in the case of contracts financed by nonappropriated funds. It merely point out that the Act does not cover direct employees of the Federal Government, and, of course, was not intended to do so. To the contrary, it demonstrates a

---

[4]*See, e.g.,* H. Report, pp. 2-3; S. Report, pp. 3-4; 111 Cong. Rec. 24388 (Burton).

[5]*Service Contract Act of 1965,* Hearing before the Subcommittee of Labor of the Committee on Labor and Public Welfare, United States Senate, 89th Cong., 1st sess. p. 15 (1965).

[6]Presidential directives and Civil Service regulations providing for prevailing rates for blue-collar direct employees of the Federal Government were inapplicable to employees of non-appropriated fund activities.

congressional purpose that all Government employees ought to be covered by legislation prohibiting substandard wages and working conditions, that it should not make any difference whether employees work directly for the Government or for Government contractors or subcontractors, and as to the latter whether the money paid to them is derived from appropriated or nonappropriated funds.

## III.

Finally, the argument is made that when Congress means the term "United States" to include the Federal Reserve banks it does so expressly; hence, that a failure to do so here indicates a legislative intent that the Act should not apply to the Federal Reserve banks. It is true that some statutes expressly state that a provision applicable to the United States or to Federal Agencies encompasses the Federal Reserve banks. *See, e.g.*, § 2(2) of the Labor-Management Relations Act, 29 U.S.C. § 152(2); § 101(1) of the Uniform Assistance and Real Property Acquisition Act of 1970, 42 U.S.C. § 4601(1). To those statutes have been added within the last year the Act of November 16, 1977, amending 18 U.S.C. § 208, one of the conflict-of-interest statutes, to include specifically the directors, officers, and employees of the Federal Reserve banks; and the Federal Banking Agency Audit Act, Pub. L. No. 95-320, 92 Stat. 391-2, amending § 117 of the Accounting and Auditing Act of 1950, 31 U.S.C. § 67, which subjects the Federal Reserve banks to a limited extent to an audit by the General Accounting Office. On the other hand, the Federal Reserve banks have informed us that they have submitted themselves to the operation of certain statutes which exempt the United States from their operation but do not in terms extend the exemption to the Federal Reserve banks. *See, e.g.*, § 3(d) of the Fair Labor Standards Act, 29 U.S.C. § 203(d) of the Fair Labor Standards Act, 29 U.S.C. § 203(d); § 3(5) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 652(5); § 701(b) of Title VII (Equal Employment Opportunities) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

These legislative precedents show that Congress has at times expressly indicated that the term "United States" includes the Federal Reserve banks, and there may be additional instances to that effect. This, however, does not demonstrate a consistent drafting technique of Congress to the effect that a statute applicable to the United States never applies to the Federal Reserve banks in the absence of a specific provision to that effect.

The legislative history of the Act shows that the specific question whether the coverage of the Act should include the Federal Reserve banks was not brought to the attention of Congress nor considered by it. A noteworthy analysis of such a situation may be found in Chief Justice Marshall's opinion in *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 644 (1819). That case involved the question whether the Contract Clause of the Constitution (Art. I, § 10, cl.1) applied to corporate charters. After having stated that it was "more than possible" that the Framers of the Constitution did not have the preservation of such charters in mind when they drafted the Contract Clause, the Chief Justice stated:

216

> It is not enough to say, that this particular case was not in the mind of the convention, when the article was framed. . . . It is necessary to go further, and to say that had this particular case been suggested, the language would have been so varied, as to exclude it, or it would have been made a special exception.

*See also, Ozawa* v. *United States,* 260 U.S. 178, 195-198 (1922); *United States* v. *Thind,* 261 U.S. 204, 207-208 (1923);[7] *Puerto Rico* v. *Shell Co.,* 302 U.S. 253, 257-259 (1937); *United States* v. *Standard Oil Co.,* 404 U.S. 558, 559-560 (1972).

Particularly pertinent in the context is *Puerto Rico* v. *Shell Co., supra,* concerning the question whether the term "any Territory of the United States" in § 3 of the Sherman Act, 15 U.S.C. § 3, included an unincorporated insular dependency, such as Puerto Rico, which did not exist when the Sherman Act was enacted in 1890. The Court answered the question in the affirmative in view of the congressional purpose to "deal comprehensively with the subject of contracts, combinations, and conspiracies in restraint of trade, 'and to that end to exercise all the power it possessed.'"[8]

The test, established by those decisions of the Supreme Court, is whether Congress would have excluded the Federal Reserve banks from the coverage of the Act, if that question had been brought to its attention. In our view, this question must be answered in the negative, based on the following: *First,* the close connection, if not the identity, of the Federal Reserve banks with the United States and the important governmental functions performed by them; *second,* the purpose of the Act evidenced by the House debate, the Senate hearings, and the Senate report, to protect the labor standards of all those working directly or indirectly for the Government who were not already covered by pertinent legislation.[9]

A related consideration is that the Act constitutes highly remedial legislation designed to benefit, as stated in the House and Senate reports, "one of the most disadvantaged groups of our workers." A familiar canon of statutory construction requires that such legislation "should be construed broadly to effectuate its purposes." *See, e.g., Tcherepnin* v. *Knight,* 389 U.S. 332, 336 (1967).

In summary, it is our opinion that the Act applies to the Federal Reserve banks. We add as a word of caution that we reach this result because of the purposes the Act was designed to achieve and its legislative history. This

---

[7]These two cases involved the question whether the Congress which enacted the Naturalization Act of 1790 would have included Japanese and high-caste "aryan" Hindus in the term "free white person," who alone were eligible for naturalization. The Court answered the question in the negative.

[8]*United States* v. *Standard Oil Co.,* 404 U.S. 558 (1972), decided on the basis of the same considerations that § 3 of the Sherman Act applied to American Samoa.

[9]The congressional awareness of the predominantly governmental character of the Federal Reserve banks has been underscored by the recent legislation, referred to above, extending to them some aspects of the conflict-of-interest statutes and of the Comptroller General's auditing authority. Legislation was required for those purposes since 18 U.S.C. § 208 is a criminal statute, and because a statute, 31 U.S.C. § 53, had precluded auditing by the Comptroller General of nonappropriated fund Agencies such as the Federal Reserve banks.

opinion therefore does not necessarily stand for the proposition that the term "United States" as used in other statutes equally applies to the Federal Reserve banks.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*