**GULF OIL CORPORATION, Appellant,**

v.

**PANAMA CANAL COMPANY, Appellee.**

**No. 25141.**

United States Court of Appeals
Fifth Circuit.

Feb. 5, 1969.

Stanley R. Wright, Joseph C. Smith, New York City, for appellant.

Jerry W. Mitchell, Dwight A. McKabney, Balboa Heights, Canal Zone, for appellee.

Before JOHN R. BROWN, Chief Judge, DYER, Circuit Judge, and GARZA, District Judge.

JOHN R. BROWN, Chief Judge:

The problem here is the old, old one of sovereign immunity. Here the only new wrinkle, Mike Hooks, Inc. v. Pena, 5 Cir., 1963, 313 F.2d 696, 697, 1963 A.M. C. 355, 356, is that it has to be towed in stern-first since the governmental corporation invoking this ancient and generally discredited trapping of the King-can-do-no-wrong era is given express statutory power to sue and be sued. Of course it has to have some theory to overcome such an explicit waiver. In a sort of what-the-right-hand-giveth the left-hand-taketh-away approach, it finds this in a statutory provision requiring a specific notice of claim as a condition of suit. But strained theorizing is not confined to the pursued. The pursuer likewise finds it attractive, so much so that one of its arguments takes the frank form that the judiciary can disregard explicit statutory language on the ground, not that Congress did not enact it, but rather in doing so, Congress did not know what it was doing.

What brings all this about is just another case, like thousands before, where rudder damage subsequently manifesting itself is related back to an earlier claimed touching of bank or bottom. The victim was the S/S GULF-SPRAY, the culprit the Panama Canal Company whose compulsory pilot was conning the vessel.

In more austere terms, what brings this about is the failure of the damage claimant shipowner to comply literally with § 297 of Title 2 of the Canal Zone Code [1] which is an integral part of a

---

1. Title 2 Canal Zone Code § 297. Investigation of accident or injury giving rise to claim

"Notwithstanding any other law, a claim may not be considered under this subchapter, or an action for damages lie

precise structure creating civil liabilities and prescribing procedural remedies.[2] Section 297 requires notice of the claim prior to the departure of the vessel from the Canal Zone. The shipowner did not give such notice or make such claim, but not because it was ignorant of, or ignored the requirements, but rather because such notice-claim could not be given since the damage was not identified in nature and cause until after the ship had left the Canal Zone. On the Panama Canal Company's motion to dismiss, the shipowner suffered a second grounding when the Judge—in one of those situations where the decision is bound to be right because it is so wrong [3]—expressing distress at the law's harshness, dismissed the suit thereon, unless, prior to the departure from Canal Zone waters of the vessel involved:

(1) the investigation by the competent authorities of the accident or injury giving rise to the claim has been completed; and

(2) the basis for the claim has been laid before the Panama Canal Company." 76A Stat. 25.

2. Title 2 Canal Zone Code
Chapter 11, Claims for Injuries to Persons or Property.
Subchapter II—Claims Arising From Operations of Canal
* * * * *
§ 292. Injuries outside locks
"The Panama Canal Company shall promptly adjust and pay damages for injuries to vessels, or to the cargo, crew, or passengers of vessels which may arise by reason of their presence in the waters of the Canal Zone, other than the locks, when the injury was proximately caused by negligence or fault on the part of an officer or employee of the Company acting within the scope of his employment and in the line of his duties in connection with the operation of the canal. If the negligence or fault of the vessel, master, crew, or passengers proximately contributed to the injury, the award of damages shall be diminished in proportion to the negligence or fault attributable to the vessel, master, crew, or passengers. In the case of a vessel which is required by or pursuant to regulations prescribed pursuant to section 1331 of this title to have a Panama Canal pilot on duty aboard, damages may not be adjusted and paid for injuries to the vessel, or its cargo, crew, or passengers, incurred while the vessel was under way and in motion, unless at the time the injuries were incurred the navigation or movement of the vessel was under the control of a Panama Canal pilot." 76A Stat. 23.
* * * * *
§ 296. Actions on claims
"A claimant for damages pursuant to section 291 or 292 of this title who considers himself aggrieved by the findings, determination, or award of the Panama Canal Company in reference to his claim may bring an action on the claim against the Company in the United States District Court for the District of the Canal Zone. In the action, the provisions of this subchapter, relative to the determination, adjustment, and payment of claims, and the provisions of the regulations established pursuant to section 1331 of this title, relative to navigation of Canal Zone waters and to transiting the Panama Canal, shall apply. An action for damages cognizable under this section shall not lie against the Company, otherwise, nor in any other court, than as provided in this section; nor may it lie against any officer or employee of the Company.

This section does not prohibit actions against the Company's officers or employees for damages or injuries resulting from their acts outside the scope of their employment or not in the line of their duties, or from their acts committed with intent to injure the person or property of another.

Actions under this section shall be tried by the court without a jury." 76A Stat. 24.

3. "The rule seems harsh and its application in this case indeed appears to work a hardship upon plaintiff as it did not know that it had been damaged until after its vessel had left the Canal Zone waters and made a test run in the open sea. Its ship then returned and it was offered for inspection and investigation by the authorities and attempted to lay claim before the Panama Canal Company all within a matter of hours and apparently as soon as reasonably possible."

"In view of the state of the law, it is believed that it is best to dismiss the complaint and if the plaintiff wishes to appeal to test the manner of applying the statute, he can do so at this stage of the proceedings without the need of a full dress and expensive trial on all questions." Gulf Oil Corp. v. Panama Canal Co., D.C.Z., 1967, 269 F.Supp. 793, 795, 796.

In Lawrence v. United States, 5 Cir., 1967, 378 F.2d 452, 467, we put it this

for failure to comply with § 297 (note 1, supra).

With factual particularity unknown to notice pleaders as libels transform into complaints and proctors with their esoteric traditions metamorphose into unadorned attorneys,[4] the claim which was credited by the motion to dismiss with but slight paraphrasing went like this. The S/S GULFSPRAY, a steel tank vessel departed Southwest Pass, Mississippi River for the Panama Canal. Her draft was 33′ 2″ forward and 33′ 8″ aft. No difficulty was experienced with the steering gear and GULFSPRAY required no more than 10 deg. rudder in either direction, 10 deg. being the maximum rudder obtainable on automatic steering. Approaching the Panama Canal Zone, the steering was shifted to manual and remained under manual control until after completion of the Panama Canal transit. On arrival at the Atlantic side at 0600 on April 2, 1966, GULFSPRAY was accepted for transit of the canal. Two Panama Canal pilots boarded her and took charge of her navigation. During the transit of the canal and while in the channel of the Pacific side, GULFSPRAY's rudder responded normally to the orders of the Panama Canal pilots. After clearing Miraflores Locks at 1810, GULFSPRAY continued south in the Pacific side channel at bare steerageway to allow a vessel in Balboa Harbor to clear before GULFSPRAY entered. When the vessel cleared, GULFSPRAY's rudder was ordered hard left and her swing into Balboa Harbor commenced. At 1836½ her engines were ordered full astern and remained so for about three minutes, during which time GULFSPRAY stopped dead in the water and moved in an astern direction toward the west bank of the channel while she was angled across the channel, forcing her rudder, which was still in a hard left position, against the bank outside the designated channel line. Nothing was heard or felt by GULFSPRAY's officers or crew to indicate the rudder had come into contact with the bank. With the assistance of a tug, the vessel was then moved to an anchorage to wait for a berth at the bunkering dock. While at anchor, the steering was checked and found to be operating normally. At 2100, GULFSPRAY, with the assistance of two tugs, was moved from the anchorage to the bunkering dock and at 0400 on April 3, 1966, on completion of bunkering, her steering gear was again checked and found to be operating normally and she sailed from the dock assisted by two tugs and with a Panama Canal pilot in charge of her navigation. After the tugs were discharged in the Pacific side entrance channel it was observed that the vessel required 15 to 20 deg. right rudder to maintain the channel course, which was attributed to a strong cross current in the channel. At about 0500 the Panama Canal pilot was discharged and at 0512 departure was taken. The vessel continued to carry 15 to 20 deg. right rudder to maintain her course and GULFSPRAY's master and chief engineer made various tests and inspections to determine the cause of the excessive right rudder including shifting the steering to automatic gyro pilot whereupon the vessel started into a left

way: "The painstaking opinion by Judge Waterman—painstaking not only in the careful exploration of every conceivable way to find jurisdiction, but also painstaking in the evident sense of trying to find an escape from a painfully unfortunate result—closes all of the doors to the District Court." See the statement of Judge Friendly in Spanos v. Skouras Theatres Corp., 2 Cir., 1966, 364 F.2d 161, 167: "The compulsion felt by my brothers * * * to reach what seems a palpably unjust result reminds me of Chief Justice Erle's observa- tion as to the occasional predilection of the best of judges for 'a strong decision,' to wit, one 'opposed to common-sense and to common convenience.' "

4. The suit was commenced as a libel in admiralty. In the meantime the Revised Rules were adopted bringing about the long-sought major integration of admiralty into the Civil Rules. The amended pleading now had to be called a complaint with express identification as a maritime claim. F.R.Civ.P. 9(h). See 39 F.R.D. 69, 75 (1966). See also 39 F.R.D. 146 Supplemental Rules (1966).

turn. When no damage or irregularity was found with the steering gear inside the vessel's hull, it was concluded that the rudder was damaged. At 0850 the vessel's course was reversed and at 1305 she was anchored off the Pacific side entrance channel awaiting instructions and clearance to enter the harbor. GULFSPRAY arrived at the bunkering dock at 0700, April 4, 1966, and at 0900 a Panama Canal Company diver determined that the rudder was twisted 22 inches from the centerline of the vessel when the rudder indicators were in the centerline position. At all times between 0500 April 3, 1966, and 1305 April 3, 1966, GULFSPRAY was safely afloat and sustained no damage to her rudder or steering gear.

Then followed precise allegations showing both an awareness of § 297 (note 1 *supra*) and the physical inability of complying with it, but at the same time, an effort to fulfill its spirit. The complaint went on. The Panama Canal Company was immediately notified of the damage and a request for an investigation was made before GULFSPRAY proceeded on her voyage. The Supervising Inspector of the Board of Local Inspectors denied the request for an investigation, and the claim against the Panama Canal Company for damages made before the vessel sailed at 0142 on April 5, 1966, was rejected. The ship proceeded on to San Pedro, California, where the vessel drydocked for survey and repairs. Panama Canal Company was invited to attend the survey and inspect the vessel, but did not attend.

The Canal Company's basic response is the common knee-jerk reflex which seems so surprising in the face of strong congressional expressions on all fronts subjecting corporate agencies to suit.

This is the plea that waiver of sovereign immunity must be strictly, severely construed. On that premise it can then argue that the sweeping provisions imposing civil liabilities on the Canal Company and prescribing equally effective remedies (see note 2 *supra*) plus a general power to sue and be sued [5] are withdrawn by the notice-claim requirement of § 297.

But this approach is outmoded. In the structure of the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., the Public Vessels Act, 46 U.S.C.A. § 781 et seq., and the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b) which expose the government in all of its sovereign glory to almost unlimited liabilities comparable to private parties, the approach is to construe the waiver sensibly, naturally, which means most of the time, literally. Although repeated expressions do not daunt the sovereign's representatives in dragging out the old markers of this ancient shibboleth, they are plain enough to read and heed. "[W]aivers by Congress of governmental immunity from suit should be liberally construed in the case of federal instrumentalities * * *. R.F.C. v. J. G. Menihan Corp., 1941, 312 U.S. 81, 84, 61 S.Ct. 485, 487, 85 L.Ed. 595, 598. "[W]e think Congressional adoption of broad statutory language authorizing suit was deliberate and is not to be thwarted by an unduly restrictive interpretation." Canadian Aviator, Ltd. v. United States, 1944, 324 U.S. 215, 222, 65 S.Ct. 639, 643, 89 L.Ed. 901, 907. There is to be no niggardly construction for "when Congress authorized federal instrumentalities of the type here involved to 'sue and be sued', it used those words in their usual and ordinary sense." F.H.A. v. Burr, 1940, 309 U.S. 242, 246,

---

5. § 65. General powers of Company

"(a) The Panama Canal Company may:

(1) * * *

(2) * * *

(3) sue and be sued in its corporate name, but an attachment, garnishment, or similar process may not be issued against salaries or other moneys owed by the Company to its employees;

(4) enter into contracts, leases, agreements, or other transactions;

(5) * * *

(6) * * *

(b) The Panama Canal Company has the priority of the United States in the payment of debts out of bankrupt estates."

60 S.Ct. 488, 491, 84 L.Ed. 724, 729. This is especially true of corporate instrumentalities. "In spawning these corporations during the past two decades, Congress has uniformly included amenability to law. Congress has provided for not less than forty of such corporations discharging governmental functions, and without exception the authority to-sue-and-be-sued was included." It is "Congress' * * * emphatic practice not to confer sovereign immunity upon these government corporations." *Keifer & Keifer v. R.F.C.*, 1938, 306 U.S. 381, 390, 393, 59 S.Ct. 516, 518, 520, 83 L.Ed. 784, 789, 791. And it is well summed up in *Menihan, supra*. "In the Keifer case * * * recognizing that Congress may endow a governmental corporation with the government's immunity, we found the question to be 'Has it done so?' That is, immunity in the case of a governmental agency is not presumed. We sought evidence that Congress had intended that its creature, considering the purpose and scope of its powers, should have the immunity which the sovereign itself enjoyed, and we noted the practice of Congress as an indication 'of the present climate of opinion' which had brought governmental immunity from suit into disfavor. Accordingly, being unable to find that Congress had intended immunity from suit we denied it." 312 U.S. at 84, 61 S.Ct. at 486, 85 L.Ed at 597. And without a doubt, the transmutations by the United States, of the political and business direction of the Canal Zone eliminate any doubt that Congress, by severely divorcing political activities from those of physical-business operations, meant to launch the new Panama Canal Company as one exposed to the usual incidents of such business operation. It started in 1948 with the substitution of a federally chartered Panama Railroad Company for the former New York Corporation although operational lines remained much the same. With growing problems over setting toll rates and fairly attributing a fair portion of costs to Canal operations, including health and public welfare, all business activities, including the conduct of all Canal transit facilities were placed upon the corporation, now renamed the Panama Canal Company, with remaining civil governmental activities put on the renamed Canal Zone Government.[6] The physical operation of all facilities of the

---

6. *Abbott v. United States*, 1953, 112 F. Supp. 801, 802–803, 125 Ct.Cl. 330:

   "By the Act of June 29, 1948, c. 706, 62 Stat. 1075, 48 U.S.C. § 1361, et seq., U.S.Code Cong. Service, 1948, p. 762, the *New York corporation was abolished and a federally chartered corporation bearing the same name, the Panama Railroad Company, was created. It took over the assets and assumed the liabilities of the New York corporation and carried on the same functions.* The new federal charter took the form of a new Article 3 in Chapter 12 of title 2 of the Canal Zone Code.
   *       *       *       *       *
   "By the Act of September 26, 1950, c. 1049, 64 Stat. 1041, U.S.Code Cong. Service 1950, p. 1035, the statement of purpose in Section 249 was amended to include the operation by the Railroad Company of the Canal itself, which, as we have seen, had formerly been operated directly by the United States.
   *       *       *       *       *
   "The Act of September 26, 1950 also changed the name of the corporation to Panama Canal Company and changed the name of the agency theretofore known as the Panama Canal, to Canal Zone Government."

   See also *Panama Canal Company v. Grace Line*, 1958, 356 U.S. 309, 311, 78 S.Ct. 752, 753, 2 L.Ed.2d 788, 789:

   "Petitioner was created by Congress in 1950. 64 Stat. 1041. It holds the assets of the Panama Canal and has the duty of operating and maintaining it. It may sue and be sued in its corporate name. Canal Zone Code, Tit. 2, § 248, 62 Stat. 1078, as amended, 64 Stat. 1038. Prior to 1950 the Panama Canal was operated by the President through the Governor of the Canal Zone. 37 Stat. 561. Business activities incident to that operation were conducted by the Panama Railroad Co., a federal corporation, 62 Stat. 1076, which was an agency and instrumentality of the United States, *ibid*. Those auxiliary business activities were 'designed and used to aid' in the management and operation of the Canal. See *People of State of New York ex rel. Rogers v. Graves*, 299 U.S. 401, 406, 57 S.Ct.

Canal, including the transiting of vessels was to be business—big business and *all* business.[7]

■ We therefore are of the clear view that by § 297 Congress did not mean to withdraw its sweeping waiver, amplified as it was with substantive and procedural principles effectively imposing traditional liabilities on the Canal Company. But before determining what the role of § 297 is we think it best to dispose of the shipowner's novel contention of congressional ignorance which, if successful, would eliminate all problems of construction and application.

■ No matter how beguiling the structure of the argument, it should come as no shock that we disclaim a power to

expunge legislation because of claimed congressional unawareness of what it was doing. But this offers no trouble here.

The contention is the bald one that the provisions enacted along with § 297 were represented to be merely a desirable codification of existing law and were "technical or clarifying in character and do not change in the slightest degree the substance of the [earlier] proposed legislation". S.Rep. No. 2531, 81st Cong., 2d Sess., 1950, U.S.Code Cong. Service at 3926. Indeed, they were so much so that to secure early passage of the major objectives of the Act it was recommended that these "non controversial" provisions proposed by the Canal authorities be deleted for the time being.[8] But for

---

269, 271, 81 L.Ed. 306. Since 1950 all those business activities have been carried on by petitioner, the Panama Canal Co., all of whose stock is held by the President or his designee, Canal Zone Code, Tit. 2, § 246(a), the present designee being the Secretary of the Army.

"* * * When President Truman in 1948 sought to increase the toll rate to the statutory maximum, 62 Stat. 1494, Congress asked the President to withhold action until the entire problem could be studied. See H.R.Rep. No. 1304, 81st Cong., 1st Sess. 7. President Truman agreed by revoking his proclamation, 64 Stat. A433, and agreeing to the study.

"On the basis of that study Congress separated the governmental functions of the Canal from its transit and business functions, the latter to be operated by petitioner. See H.R.Doc. No. 460, 81st Cong., 2d Sess.; H.R.Rep. No. 2935, 81st Cong., 2d Sess."

7. This echoed the reasons underlying the 1948–49 opposition of the Canal Zone authorities to inclusion in the Federal Tort Claims Act. See letter of the Secretary of the Army quoting with approval like expressions of the Governor of the Canal Zone:

"* * * [T]he broader reason for the exclusion of the Panama Railroad Company from the Tort Claims Act is that the act is not designed to fit the needs of a corporation acting as a common carrier and performing the other commercial functions which are a part of the Company's operations. Since it is engaged in business as a

common carrier and in other commercial enterprises, the basic policies underlying governmental immunity from suit do not apply to the Company, and it is desirable if not essential to continue unimpaired the ability of the Company to effect prompt settlement of meritorious claims and the amenability of the Company to suit in the ordinary course." (S.Rep. No. 167, 1949 U.S.Code Cong. Service at 1591–1593.

See also at 1590, in which both the Senate and the House Committees reported to Congress that:

"The varied activities of the Company * * * are not those to which the principle of governmental immunity to suit should be applied."

See De Scala v. Panama Canal Company, S.D.N.Y., 1963, 222 F.Supp. 931, 934, 1964 A.M.C. 482, 486; and Gardner v. Panama Railroad Co., 1951, 342 U.S. 29, 32 n. 5, 72 S.Ct. 12, 14 n. 5, 96 L.Ed. 31, 37, n. 5 citing H.R.Rep. No. 830, 81st. Cong., 1st Sess. (1949).

8. The shipowner stresses H.R.Rep. No. 2935, to accompany H.R. 8677, 81st Cong., 2d Sess. (1950):

"Certain additional provisions deemed desirable by the Panama Canal authorities in the interest of codification or of supplementing these recommendations were included in the bill as introduced. Although these provisions appear to be noncontroversial and may be desirable, your committee believes that their inclusion at this late date in the present session might prove to be an unduly burdensome undertaking and might have the effect of impeding the

some reason wholly undisclosed, and probably now unascertainable, what was to be deleted was left in as the bill was finally enacted. This leads the shipowner to assert three things. First, all were told that these provisions were merely codifications with nothing new added. Second, since they were something new and now of claimed significance, Congress passed them under a serious misapprehension. Third, as a consequence, the enactment must be disregarded.

> passage of the other provisions of the bill which are of much greater importance. Your committee therefore has deleted the following sections of the bill: Sections 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 23."
>
> Similar expressions were made by the Director of the Bureau of the Budget that the Amendments "have as their principal purpose the clarification and codification of existing law", and by the Secretary of the Army that "none of the codifying provisions are essentially new and are comparatively simple and non controversial."
>
> Hearings on H.R. 8677 before the Subcommittee on the Panama Canal of the House Committee on Merchant Marine and Fisheries, 81st Cong., 2d Sess., at 26, 63 (1950) [hereinafter cited as Hearings].

9. The Governor of the Canal Zone, in his report to the Secretary of the Army, analyzing the bill in detail, commented on the forerunner to § 297 and related provisions:

"Section 7, Amending 2 Canal Zone Code, Section 10

16. Section 10 of title 2, Canal Zone Code, dealing with claims for damages for injuries to vessels, or to the cargo, crew or passengers of vessels, occasioned by operation of the Panama Canal was last amended by the act of June 13, 1940 (54 Stat. 387). It requires amendment in this bill because, with the transfer of canal operation to the corporation, the claims, and any ultimate suits, will be against the corporation.

17. The new section retains the same rules as to liability within and without the locks of the canal as obtain today, but permits suits in all cases wherein the claim is not susceptible to amicable settlement, whereas the present section permits suits only in cases originating in the locks of the canal. The basis for this change is the policy change occasioned by the passage of the Federal Tort

The quick answer to this is that in words that even those who ran could read, the proponents of these provisions were correct in allowing them to be characterized as "not new", "codifications", etc. The error, if it really was one, was in treating their antecedents as "statutes" which they really were in all practical respects since they were to replace Presidential Regulations now made obsolete by the Congressional decision to transfer all transit operations from the government to the renamed Canal Company.[9]

Claims Act. The new section restricts suits to the United States District Court for the District of the Canal Zone, and provides for trial to the court without a jury as in the Federal Tort Claims Act (see 28 U.S. sec. 2402). Incidentally the Federal Tort Claims Procedure is not applicable to any of the activities of this corporation, in view of subparagraph (m) of section 2680 of title 28, United States Code; and see section 28 of the draft bill respecting the repeal of subparagraph (g) of said section 2630.

18. The new section would permit handling of all claims regardless of size, whereas the present section requires the submission to the Congress of claims in excess of $60,000. The nature of the corporate fiscal set-up, and the availability of judicial review in all cases, are the bases for the elimination of the restriction as to large claims.

19. The new section inserts for the first time provisions respecting measure of damages, and requiring investigation before the departure of the vessel involved, which provisions were previously covered by Presidential rules but are now desired in the law so as unquestionably to establish their validity.

20. Except for the changes outlined above, the text of the new section derives in major part from the present sections as amended in 1940 and from certain present navigation rules of the President (see 35 CFR 4.128 through 4.135) which have stood the test of experience as to their substantive suitability.

Section 8, Adding 2 Canal Zone Code, Section 10A and 10B

21. Added section 10A deals with investigation, by the Board of Local Inspectors of the Canal Zone Government, of accidents or injuries to vessels which may be the basis of a claim against the Panama Canal Company and of cases of injury by vessels to structures, plant, or equipment of the corporation. The text is derived basically from a present

We conclude, therefore, that § 297 has vitality and says what it means. What does it mean? We are equally of the view that Congress did not couch this in the restrictive quasi-judicial terms of a withdrawal of sovereign immunity in other respects so generously waived. We do not think Congress to be so incongruous. It does not wish to add to the difficulties which seem irrepressible as the citizen pursues these instrumentalities.

■ This is more than mere words, for classifying § 297 as a withdrawal of immunity, as the Canal Company would have us do, would have awesome overtones approaching jurisdiction. Everything therefore points in the direction of a congressional policy to continue the former regulatory practice (see note 9 supra) which assured notice of an occurrence and the assertion of a claim before the vessel departed the Zone. This afforded opportunity for meaningful investigation. As such it is a requirement to be construed and applied in the light of its purpose and a realistic ability to comply with it.

■ It makes no sense at all to ascribe to a generous Congress the waiver of immunity which, to be effectually exploited, has to be preceded by a formal notice which could not physically have been given. Where the occurrence is such that a prudent person would have known of the likelihood of damage which, in like prudence, was fairly attributable to the Panama Canal Company's employees prior to the vessel's departure, the notice must be given and the claim made. Conversely, when prudence does not charge the damage claimant with such knowledge and opportunity prior to departure it is not fatal to the claim or later suit. In such situations the spirit of the requirements is satisfied if the notice-claim is given as soon as reasonably possible.

■ On the allegations the shipowner did all it could. Indeed its efforts by returning to the canal, giving formal notice, requesting the investigation by the inspectors, all within a very few hours of first departure, gave the Panama Canal Company everything a literal compliance would have afforded. A reasonable interpretation produces a reasonable result. An unreasonable interpretation produces a harsh absurdity. We put ourselves on the side of reason and if, with like reason, the shipowner brings itself within these principles, there is no more obstacle to the Panama Canal Company's carrying the burden of tort liability here, than there is to it carrying the burden, as it concededly does, for tortious damage caused by one of its vessels to a longshoreman on a New York pier. De Scala v. Panama Canal Co., S.D.N.Y., 1963, 222 F.Supp. 931, 1964 A.M.C. 482.

Reversed and remanded.

Presidential rule (see 35 CFR 4.133), but is deemed to belong in the law.

22. Added section 10B, relative to liability for injuries by vessels to canal structures or equipment, based textually upon present Presidential rules (see 35 CFR 4.138 to 4.140), would remove the doubt as to the force of these provisions as regulations which doubt would be somewhat enhanced by the transfer of canal operation to the corporation."

Hearings, at 16.

See also his testimony and further statement.

"Adaptation of Statutes Other Than the Charter.

11. In the present bill, sections 1 to 16, 23, 26 and 27 are designed to adapt the statutes relative to the Panama Canal and the Panama Railroad Company, other than the corporate charter, to the new distribution of functions which the bill would effect as between the agency and the corporation. These sections appear to require no extended general comment.

12. A section of considerable interest is section 1 of the bill, amending section 5 of title 2, and establishing the new name (Canal Zone Government) and diminished functions of the agency now known as the Panama Canal.

13. A further section of importance is section 7 of the bill amending section 10 of title 2, Canal Zone Code, respecting claims for damages for injuries to vessels, or to the cargo, crew or passengers of vessels, occasioned by the operation of the Canal. The transfer of Canal operation to the corporation makes imperative some change in said section 10."

Hearings, at 30.

The present § 297 was adapted from former 35 CFR 4.133.