**SUN LINE GREECE SPECIAL SHIPPING CO.**

v.

**The PANAMA CANAL COMMISSION.**

Civ. A. No. 82–4289.

United States District Court,
E.D. Louisiana.

Feb. 27, 1984.

Hollis M. Walker, Jr., Lenore E. McQuilling, Walker & Corsa, New York City, Terriberry, Carroll & Yancy, New Orleans, La., for plaintiff.

Thomas W. Osborne, U.S. Dept. of Justice, Washington, D.C., Michael J. O'Kane, Panama Canal Com'n, Miami, Fla., for the Panama Canal Com'n.

WICKER, District Judge.

Plaintiff, Sun Line Greece Special Shipping Company (Sun Line), as owner of the cruise ship SS STELLA SOLARIS (SOLARIS), brought this suit against the Panama Canal Commission (Commission) for damages which the vessel sustained on January

1, 1982 when she struck the wall of the Pedro Miguel Locks of the Panama Canal, while under the control of a Canal Commission pilot and crew.

Trial was held before the Court on a former date. After considering the pleadings, the evidence adduced at trial, the briefs and arguments of counsel and the applicable law, the Court enters the following opinion in accordance with Rule 52 of the Federal Rules of Civil Procedure.

It is undisputed that the SOLARIS is a cruise ship which regularly traverses the Canal, visiting various ports of call in the Caribbean. On January 1, 1982, the vessel was on such a cruise. She had a full crew and over 500 passengers aboard. At approximately 6:00 or 6:30 a.m., before the southbound SOLARIS entered the Canal from the Atlantic side, and in accordance with the regulations of the Commission, she was boarded by Captain Charles E. Faas (a Commission pilot), Tacky C. Nichols (an assistant pilot or "knuckle duster" employed by the Commission), and a Commission crew which assumed command and control of the SOLARIS.

The evidence reflects that the ship passed uneventfully through the Gatun Locks. At 12:48 p.m. she passed "the Arrow," which signaled the approach to the Pedro Miguel Locks. As the vessel approached the jaws of the lock, a series of towing wires from the Canal's locomotives were made fast to the ship. However, as she proceeded, a Northwest wind of approximately 3 [1] or 4 [2] Beaufort Scale force pushed her stern so that the vessel approached the locks on an oblique rather than a direct angle. At 12:55 p.m., the port side of the ship hit the Knuckle or Wing Wall of the lock.[3] The ship then swung to starboard; the stem of the bow struck the Center Wall of the lock and the ship ricochetted back so that the port side struck the Wing Wall a second time.[4]

Following the collision, the ship passed through the lock and proceeded on to Balboa, Panama where it anchored. In Balboa, Captain Justin Bonanno, Chairman of the Board of Local Inspectors (Board), boarded the ship.

Mr. Ch. A. Keusseoglou, owner of the SOLARIS, who was a passenger on this cruise, requested that Captain Bonanno conduct an immediate investigation of the incident so that the ship could depart for a northbound transit at midnight on January 1 and avoid consequential damages.[5] The SOLARIS was scheduled to be in the San Blas Islands on January 2 and in Montego Bay, Jamaica on January 4. Keusseoglou testified that if the vessel missed ports of call listed on the cruise itinerary, Sun Line was obligated to reimburse its passengers *pro rata*, based upon how many ports of call were cancelled. The evidence revealed that there was no practical means of transporting the SOLARIS' passengers from the Canal to the San Blas Islands.[6] Accordingly, if the vessel were required to remain in the Canal beyond its departure time, Sun Line either had to cancel one or more of the remaining ports of call or, assuming no hardship to its passengers, extend the cruise beyond the time specified. This lat-

---

1. Deposition of Captain Benas, Master of the Solaris, p. 14.

2. Deposition of Nichols, p. 16.

3. Plaintiff's Exhibit 8; testimony of Faas, Nichols and Benas.

4. Deposition of Frank Riser, the lockmaster pp. 6–7; deposition of Benas p. 16; testimony of Tacky Nichols.

5. In 1978 the same ship had suffered an accident in the Canal. An investigation was conducted. This caused a delay which necessitated Sun Line to stop the cruise, fly all passengers back to Houston, Texas and reimburse them for

that portion of the cruise which was not delivered. Sun Line sued the then Panama Canal Company and was awarded over $1,500,000.00 by the District Court, which award included consequential damages for refunds made to passengers for early termination of the voyage and lost profits from the subsequent cruise which had to be cancelled. *Sun Line Greece Special Shipping Co., Inc. v. Panama Canal Co.*, No. 79–0375–B (D.C.C.Z. February 25, 1981), *aff'd*, *Sun Line Greece Special Shipping Co., Inc. v. Panama Canal Co.*, 659 F.2d 1073 (5th Cir.1981).

6. Deposition of Bonanno, pp. 54–55.

ter action would then have interfered with the SOLARIS' already scheduled and booked subsequent cruise.

Because Captain Faas demanded his statutory rest period,[7] Captain Bonanno stated that an investigatory hearing could not be conducted until 8:00 a.m. on January 2. Although the shipowner requested that the hearing be delayed for three weeks, at which time the ship was next scheduled to be in the Canal, the Commission refused, despite the fact that in prior instances the board had conducted an immediate hearing without the presence of the pilot and had later reconvened to obtain the pilot's testimony.[8]

Captain Benas then filed a letter of protest[9] with the Commission, reserving his right to submit a claim to the Commission. The SOLARIS turned and headed northbound at 2:50 a.m., departing Canal waters at 1:30 p.m. on January 2,[10] before the Board had convened an investigatory hearing.

In November of 1982 the ship returned to Greece where it was drydocked and repaired. A commission representative went to Greece to inspect the damage at that time.[11]

Pursuant to 22 U.S.C. § 3776, Sun Line filed a damage claim with the Commission. After the Commission refused to settle plaintiff's claim, this suit was initiated.

Suits for damage to vessels transiting the Panama Canal are governed by 22 U.S.C. §§ 3761–78. These sections supersede former 2 Canal Zone Code §§ 271–97.

■ The Panama Canal Act of 1979 provides that, if a claimant who seeks damages arising out of an accident occurring in the locks "considers himself aggrieved by the findings, determination, or award of the Commission," he may bring an action on the claim in the Eastern District of Louisiana. 22 U.S.C. § 3776. However, "a claim may not be considered ... or an action for damages lie thereon, unless, prior to the departure from the Panama Canal of the vessel involved—(1) an investigation by the competent authorities of the accident or injury giving rise to the claim has been completed." 22 U.S.C. § 3777. The Board of Local Inspectors is designated by statute as the appropriate body to conduct this investigation. 22 U.S.C. § 3778.

The Commission contends that this Court lacks jurisdiction over plaintiff's claims since the SOLARIS departed Panama Canal waters before an investigation of the accident had been completed. This Court finds that the Commission's contention is without merit.

The Commission cites *Tsakos Shipping & Trading v. M/T TABOGA*, 597 F.2d 66 (5th Cir.1979) for the proposition that this Court is without jurisdiction. *Tsakos*, however, is distinguishable. There, the vessels' masters did not request an investigation or give the Canal Company an opportunity to conduct one. Rather, they signed waivers releasing the Commission from liability and then, later, attempted to recover for indemnity in spite of the waivers. In the present case, however, no waivers were signed. The SOLARIS made itself available for an inspection, which was in fact made, and the vessel's owner informed the Commission that he wished to participate in an investigatory hearing either immediately or at a later date.

22 U.S.C. § 3777 is virtually identical to former 2 Canal Zone Code § 297. The only change is the appropriate redesignation of the renamed Panama Canal Company. Although Congress did not see fit to provide guidance for § 3777, the House of Representatives Committee Report noted that § 3777 "continues the provisions of 2 C.Z. Code 297 with appropriate changes in terminology required by the geographic and

---

**7.** 35 C.F.R. § 117.1a.

**8.** Testimony of Captain Bonanno.

**9.** Plaintiff's Exhibit 5.

**10.** Plaintiff's Exhibit 7.

**11.** Plaintiff's Exhibit 35.

organizational changes made by the treaty and other provisions of this bill." [12]

In *First Shipmor Associates v. Panama Canal Co.,* 1981 A.M.C. 1762, 1764 (D.C.C. Z.1980), the Court held that "despite the language of sec. 297, the statute's requirements are not jurisdictional" but the section must be construed in light of its purpose, which is to assure that the Panama Canal Company has notice of and is granted a reasonable opportunity to investigate accidents in the Canal.[13]

The evidence reflects that the Panama Canal Company had notice of the collision and not only had a reasonable opportunity to, but did in fact, investigate the accident in question. While the SOLARIS was anchored in Balboa, Captain Bonanno, along with Jaye D. Deitz, a Commission Marine Safety Inspector, Mr. Gonsalves, a Commission Floating Equipment Inspector, Captain Faas, the Pilot, F. Diaz De Brito, a surveyor from Lloyds Register of Shipping,[14] and Marino Monassi, the head of the Technical Department of Sun Line, boarded a lifeboat which was lowered into the water from the SOLARIS. From the lifeboat, they inspected the damage to the ship.[15] Paneling was removed from the inside of the ship to expose the bare metal and an internal inspection also took place.[16] Captain Faas remained aboard the ship for two hours following docking in Balboa and participated in inspecting the damage. Captain Michael Fanning, Senior Canal Port Captain, later came aboard the vessel to discuss the incident as well.

The lockmaster, Frank Riser, prepared a report of the accident that same day [17] in which he outlined the collision which he observed and described the damage to the ship. Riser reported three strikings, each about three feet above the water line. He reported that the bow stem was bent about two feet, that there was a dent six feet long and one foot deep on the port side 100 feet back of the wheelhouse and a dent four feet long and one half foot deep on the starboard side.

Although an inspection of the damage had occurred prior to the SOLARIS' departure, the Commission contends that an onboard inspection is insufficient and, in order for this Court to have jurisdiction, 22 U.S.C. § 3777 requires that the Board complete its adversarial hearing before a ship leaves canal waters.

The Court in *First Shipmor, supra,* stated that an "inspection conducted by the Port Captain may well constitute an 'investigation by the competent authorities.'" for purposes of 22 U.S.C. § 3777. 1981 A.M.C. at 1765. To hold that an onboard inspection, rather than a full administrative hearing, is required prior to departing the Canal is the only reasonable interpretation of the statute. It is sensible for a ship to be detained long enough to assess the damage so that the Commission is not required to pay for damages for which it is not responsible. However, it would be unduly burdensome to require ships to wait in the Canal for a full adversarial proceeding, particularly in light of the fact that the Panama Canal Act does not require the Board to complete its investigation, or even to act, within any given period of time.[18] The Commission, in essence, advocates an untenable position which would allow it to avoid payment of any claims for damage simply by encouraging the Board to fail to act. Moreover, the effect of requiring the ship to remain until completion of a hearing

---

**12.** House Committee on Merchant Marine and Fisheries, Implementation of the Panama Canal Treaty of 1977, H.R. Report 94, Part II, 96th Cong., 1st Sess. 51 [April 11, 1979].

**13.** *See Gulf Oil Corp. v. Panama Canal Co.,* 407 F.2d 24, 32 (5th Cir.1969).

**14.** Mr. De Brito filed a survey report detailing the damage to the ship one week following the accident. Plaintiff's Exhibit 21.

**15.** Plaintiff's Exhibits 5, 21; Deposition of Bonanno, pp. 8, 11; Deposition of Deitz, p. 14.

**16.** Plaintiff's Exhibit 5.

**17.** Plaintiff's Exhibit 8.

**18.** 35 C.F.R. § 117.1a sets forth minimum rest periods for pilots before which time the Commission may not conduct a hearing, but does not set maximum time limits.

would be to escalate the Commission's liabilities by regularly incurring consequential damages as a result of delays. It could not have been the legislature's intent to so increase the Commission's financial obligations for the sole purported purpose of conducting a hearing which is unnecessary. This Court refuses to ascribe such a contorted intent to Congress.

The ship in this case put to port following the accident. The lockmaster filed a report outlining the accident and each of the strikings of the lock. The vessel was inspected by Captain Bonanno, members of the Commission's staff, and a surveyor. The Senior Port Captain also investigated the incident. The pilot who had caused the accident remained aboard the vessel for over two hours to discuss the event with Captain Bonanno, the owner of the ship, and its master. The owner indicated that the ship would remain until midnight to allow the Commission to complete any further necessary inspection. The ship's officers further indicated a willingness to participate in the administrative hearing upon its next scheduled transit, only three weeks hence, or at any other mutually agreeable time. The surveyor from Lloyd's filed a report outlining the damage to the vessel, dispensing with any danger that the vessel would try to attribute further damage to the Commission's actions. As was the case in *Gulf Oil Corp. v. Panama Canal Co.*, 407 F.2d 24, 32 (5th Cir.1969), the ship here has given the Commission "everything a literal compliance [with § 3777] would have afforded."

In sum, the ship gave the Commission notice of the accident and ample opportunity to conduct an inspection. It made a

good faith effort to comply with the spirit and purpose of the Act. It departed Canal waters in an effort to mitigate damages. Had it not done so, the Commission may well have tried to avoid payment of consequential damages due to the ship's failure to do what the Commission now claims was improper. To require the ship to remain in the Canal and to prohibit suit for failure to do so, would pose an unconscionable hardship on the ship and would do a disservice to the United States by causing the Commission to squander funds without apparent purpose.[19] This Court, accordingly, concludes as a matter of law, that plaintiff, having provided the Commission with notice and afforded it with a reasonable opportunity to inspect the vessel's damage, has substantially complied with the requirements of 22 U.S.C. § 3777 and is, therefore, entitled to recover for any and all damages for which the Commission is statutorily liable.[20]

■ Based upon the weight of the credible evidence, the Court finds that the proximate cause of the collision in question was the negligence of Captain Faas in failing to properly navigate the vessel through the Canal.

Captain Faas testified that, before the collision occurred and as the SOLARIS approached the locks, he recognized that the ship was too close to the "Knuckle," i.e. the point of approach where the Canal narrows just before the jaws of the lock. He testified that he employed the bow thruster[21] to push the ship away from the Knuckle and then turned the wheel to starboard while ordering engines astern.

**19.** In this regard, 35 C.F.R. § 117.1a(b) allows the Commission to commence its hearing prior to the pilot's rest time having elapsed in "exceptional cases ... in the case of ... vessels that have an imperative need to resume the voyage as soon as possible." This Court interprets this section as including such instances where delay would cause substantial increase in consequential damages for which the Commission would become liable.

**20.** Judge Sear stated in *First Shipmor,* "While [the plaintiff] may not have satisfied the literal

requirements of sec. 297, plaintiff has provided evidence to show that it gave the defendant notice and the opportunity to investigate the accident. If the Port Captain actually did conduct an informal investigation and if defendant refused two opportunities to conduct a more formal one through the Board of Local Inspectors, then sec. 297 would not bar plaintiff's claim." 1981 A.M.C. at 1766.

**21.** A small engine at the bow of the ship.

The Commission contends that the bow thruster did not work properly since it did not propel the vessel away from the Knuckle as Faas assumed it would. The testimony reveals that the Commission maintains a Data Bank Card system. Its purpose is to inform its pilots of navigational and maneuvering data regarding a particular vessel and to apprise them of any peculiarities of the ship which may have been noted by pilots during prior transits of the Canal. Faas testified that before he boarded the SOLARIS he reviewed her data bank card but, because it contained no comments from previous pilots, he assumed the bow thruster was in good working order.

Although Faas testified that after the incident in question he reported failure of the SOLARIS' bow thruster on its data bank card, the Commission introduced no evidence to substantiate this testimony. Commission personnel testified that pilot comments are carried forward onto subsequent Data Bank Cards. However, the current card [22] did not reflect any comments by Captain Faas regarding the bow thruster.

The weight of the evidence indicates that at no time prior to the accident did Captain Faas give any orders for the engines to go astern.[23] Rather, he relied upon the bow thruster to push the ship away from the Knuckle and avoid contact.

The collision occurred at 12:55 p.m. The evidence indicates that at 12:52 both port and starboard engines of the SOLARIS were dead slow ahead; at 12:55 p.m. the starboard engine was adjusted to proceed at half speed ahead. At 12:56 both engines were stopped. At 12:58 both engines were again dead slow ahead. At 13:00 the starboard engine was stopped and at 13:01 both engines were stopped.[24]

Warren R. Hardy, plaintiff's expert testified that instead of using the bow thruster,

the pilot should have twisted the ship towards the Center Wall by engaging the starboard engine ahead and the port engine astern. He stated convincingly that the bow thruster is always ineffectual in this situation, whether the main engines are in use or not, since the bow thruster has only 750 horsepower, while the main engines combine to produce 20,000 horsepower. Captain Benas testified that Faas gave the wrong orders since the port engine proceeded ahead at all times prior to the collision.[25] Faas admitted, moreover, that following the accident he noticed a plaque on the console of the wheelhouse which indicated that the bow thruster was ineffective when using the main engines.

The Court finds that the Commission has failed to prove by a preponderance of the evidence that the bow thruster was not in good working order. Rather, the overwhelming weight of the credible evidence indicated that the bow thruster was not defective, but was improperly employed by Captain Faas. A plaque in the wheelhouse indicated that the bow thruster was ineffective when the main engines were being used. Even if the main engines had not been in use, the bow thruster was the improper device to employ to push the ship away from the Knuckle in the ship's canted position. The proper course of action would have been for Captain Faas to twist the ship counterclockwise by simultaneously engaging the starboard engine ahead and the port engine astern.

■ The Commission also maintains that the maneuverability of the vessel was impaired since the ship was "down by the head," that is, deeper in the water at the bow than the stern, rather than being on an even keel. There was no evidence to show how much the ship was down by the head, if at all.[26] Nor was there testimony

22. Plaintiff's Exhibit 2.

23. Plaintiff's Exhibit 8; Deposition of Benas, pp. 16–17.

24. Ship's Bell Book, Plaintiff's Exhibit 31.

25. Deposition of Benas, pp. 16–17.

26. The Commission sought to introduce a document entitled "Undertaking to Release and Indemnify" into evidence. This document purported to demonstrate that the ship released the Commission from any loss or damage since the ship exceeded the load line and was "down by

that the SOLARIS' maneuverability was impaired by being "down by the head." Captain Faas indicated that the SOLARIS was not a particularly responsive ship, but he did not tie this characteristic to being "down by the head." Contrarily, he admitted that all ships navigate differently, that the SOLARIS was not excessively difficult to maneuver, and that some ships operate very well if down by the head.

■ Since there was no evidence to indicate that the SOLARIS' navigability generally is impaired by the condition, or that being down by the head caused or contributed to this accident, any assertion that the accident was caused by the down by the head condition is merely speculative. The Court concludes that the condition, if it existed, did not constitute contributory negligence.

The parties have stipulated that the SOLARIS' damages amounted to $226,100.77.

■ It is undisputed that the collision occurred while the SOLARIS was passing through the locks of the Panama Canal and while she was under the control of the Commission's pilot and employees. Since the Commission has failed to prove that any fault on the part of the SOLARIS, her master, crew or passengers proximately contributed to the accident, the Commission is strictly liable for the full amount of damages. 22 U.S.C. § 3771; *Globe Seaways, Inc. v. Panama Canal Company,* 509 F.2d 969, 972 (5th Cir.1975).

Let judgment be entered in favor of the plaintiff, Sun Line Greece Special Shipping Co. and against The Panama Canal Commission for the sum of $226,100.77, plus costs.

the head." The Court refused to admit the release into evidence.

35 C.F.R. § 103.4(b) provides that, if a vessel is loaded or trimmed as to adversely affect its maneuverability, its master may be required to execute an undertaking to release the Commission from liability. The document in question had not been signed by the master of the ship, but only by its purser who was Greek, and who did not speak English. The purser, after he had signed the release, which was written in Eng-

lish, asked Nichols what the release was. The release had no legal effect since it was signed by an improper party under the regulations and by one who did not understand its contents. Moreover, it was first produced only one week prior to trial although plaintiff formally had requested its production eight months previously. Finally, defendant did not affirmatively plead the defense of release as required by Fed.Rule Civ. Procedure 8(c).