THE PEOPLE OF THE STATE OF NEW YORK ex rel. RICHARD REID ROGERS, Relator, *v.* MARK GRAVES and Others, as Commissioners Constituting the State Tax Commission of the State of New York, Respondents.

Third Department, November 13, 1935.

*Richard Reid Rogers*, relator, *pro se.*

*John J. Bennett, Jr., Attorney-General* [*Joseph M. Mesnig, Assistant Attorney-General,* and *Henry Epstein, Solicitor General,* of counsel], for the respondents.

HEFFERNAN, J. Relator has invoked the writ of certiorari, under the provisions of sections 375 and 199 of the Tax Law to review a final determination of the State Tax Commission assessing additional income taxes against him for the calendar years 1927, 1928 and 1929.

During the years in question relator was employed by the Panama Railroad Company as general counsel at an annual salary of $15,000. In filing his income tax returns for those years he acknowledged receipt of the income but did not include it as part of his gross income for tax purposes. Assessments for the tax computed thereon were made by the Tax Commission.

The Panama Railroad Company is a New York corporation created by chapter 284 of the Laws of 1849. That act authorized certain named individuals to form a corporation known as Panama Railroad Company, with a capital stock of not to exceed $5,000,000 for the purpose of constructing and operating a railroad across the Isthmus of Panama under a grant made to three named individuals by the then Republic of New Grenada. As an incidental power it was authorized to own and operate steamships. Six years later, by chapter 364 of the Laws of 1855, it was granted certain additional powers and permitted to increase its capitalization to an amount not to exceed $7,000,000, its present capitalization.

So far as the record discloses, it was apparently privately owned and operated for about fifty-five years, when its entire capital stock was acquired by the United States. The entire capital stock except directors' shares is still owned of record by the United States. The company is managed by a board of thirteen directors, each of whom holds one share of stock. The directors are elected by the Secretary of War in his capacity as stockholder of record of 69,987 shares. The capital stock consists of 70,000 shares of the par value of $100.

The Panama Railroad Company conducts a general transportation business and has its principal office in the city of New York. At New York city it has about one hundred office employees, in addition to dock engineers, cargo checkers, freight clerks and passenger agents. It operates a line of steamships between New York and Canal Zone, carrying passengers and cargo. Its steamers have also operated to Haiti and South America. The company also operates a railroad across the Isthmus of Panama, a com-

missary establishment, a dairy and two hotels. The company engages in commercial business and its tariffs correspond to those of competing private carriers. It carries government freight and government employees at reduced rates. The company has been operating at a profit and has been paying dividends. Its employees are paid directly by the company from moneys derived from the company's operations. No liability rests upon the United States because of any claim for damages which might lie against the company. In competition with privately owned ocean carriers the corporation operates a fleet of steamships. It solicits and accepts commercial freight and passenger business, carrying government freight and passenger business at reduced rates.

Assuredly the railroad was originally conceived, constructed and operated as a private commercial, profit-making enterprise. That the commercial and proprietary character of the company was to be continued after the United States acquired the stock is strikingly attested by the communication which President Theodore Roosevelt addressed to the then Secretary of War, dated May 9, 1904. Mr. Roosevelt expressed a desire " that the policy of the road be completely harmonized with the policy of the Government of making it an adjunct to the construction of the canal, at the same time fulfilling the purpose for which it was constructed as a route of commercial movement across the Isthmus of Panama."

Relator's contention is that the Panama Railroad Company is an instrumentality of the United States; that as such, the company is exempt from State taxation; and that, the company being so exempt, the salaries of its officers and employees are likewise exempt.

The learned counsel for respondents asserts that the real point in issue is not only whether the Panama Railroad Company is an instrumentality of the United States, but whether the company is engaged in the conduct of either an essential or usual governmental function.

Paragraph f of subdivision 2 of section 359 of the Tax Law provides for an exemption from the application of the New York personal income tax (Tax Law, art. 16) in the case of salaries, wages and other compensation paid by the United States to its officers and employees. Relator, contending for the income tax exemption of his salary, has not invoked this statutory exemption, but rests his claim upon the fundamental, constitutional doctrine that the governmental instrumentalities and agencies of the Federal government and the various State governments are mutually immune from taxation by the other. The doctrine is thoroughly imbedded in our jurisprudence that a State is without power to

tax the property or the agencies or instrumentalities of the United States. Similarly, the Federal government lacks power to tax State property or agencies. (*Van Brocklin* v. *State of Tennessee,* 117 U. S. 151; *McCulloch* v. *State of Maryland,* 4 Wheat. 436; *Collector* v. *Day,* 11 Wall. 113.)

Immunity from taxation extends only to agencies and instrumentalities engaged in usual governmental functions. (*Railroad Company* v. *Peniston,* 18 Wall. 5; *Fox Film Corp.* v. *Doyal,* 286 U. S. 123.)

In *South Carolina* v. *United States* (199 U. S. 437) it was held that the exemption of State agencies and instrumentalities from Federal taxation is limited to those which are of a strictly governmental character, and does not extend to those used by the State in carrying on an ordinary private business. Thus, Mr. Justice BREWER, speaking for the court, said: " Now, if it be well established, as these authorities say, that there is a clear distinction as respects responsibility for negligence between the powers granted to a corporation for governmental purposes and those in aid of private business, a like distinction may be recognized when we are asked to limit the full power of imposing excises granted to the National Government by an implied inability to impede or embarrass a State in the discharge of its functions. It is reasonable to hold that while the former may do nothing by taxation in any form to prevent the full discharge by the latter of its governmental functions, yet whenever a State engages in a business which is of a private nature that business is not withdrawn from the taxing power of the Nation." A question very similar to that presented in *South Carolina* v. *United States (supra)* was decided by the United States Supreme Court in *Ohio* v. *Helvering* (292 U. S. 360). The court reiterated the principle that whenever a State engages in a business of a private nature, it exercises non-governmental functions, and the business, though conducted by the State, is not immune from the exercise of the power of taxation which the Constitution vests in the Congress. In that case it was said: " If a State chooses to go into the business of buying and selling commodities, its right to do so may be conceded; * * * but the exercise of the right is not the performance of a governmental function, and must find its support in some authority apart from the police power. When a State enters the market place seeking customers it divests itself of its *quasi* sovereignty *pro tanto,* and takes on the character of a trader, so far, at least, as the taxing power of the Federal government is concerned."

In *Flint* v. *Stone Tracy Co.* (220 U. S. 108) Mr Justice DAY, speaking for the court, said: " It is no part of the essential governmental

functions of a State to provide means of transportation, supply artificial light, water and the like. These objects are often accomplished through the medium of private corporations and, though the public may derive a benefit from such operations, the companies carrying on such enterprises are, nevertheless, private companies whose business is prosecuted for private emolument and advantage. For the purpose of taxation they stand upon the same footing as other private corporations upon which special franchises have been conferred."

The ever-widening activities of government made it inevitable that the question should again be presented to the Supreme Court of the United States, and in 1934 (*Helvering* v. *Powers*, 293 U. S. 214) there was presented the question whether the compensation of the members of the board of trustees of the Boston Elevated Railway Company was constitutionally exempt from the imposition of the Federal income tax, immunity being claimed upon the ground that the trustees were officers of the Commonwealth of Massachusetts and instrumentalities of its government. It appeared that the railway company encountered financial difficulties and, by act of the Massachusetts Legislature, agreed to by the company, was taken over by the State to be publicly operated and managed for a limited period of time. It was not disputed that the trustees who were to manage the company were officers of the State and that their salaries were fixed by the Legislature, though they were to be paid from the operations of the company. The Supreme Court of Massachusetts had previously been called upon to interpret the act in question and had characterized the operation of the railway by the State as being " undertaken by the Commonwealth, not as a source of profit, but solely for the general welfare." (*Boston* v. *Treasurer & Receiver General*, 237 Mass. 413.) The United States Supreme Court held that the salaries of the trustees were not constitutionally immune from the imposition of the Federal income tax.

There followed the decision of the Circuit Court of Appeals, Second Circuit, in *Commissioner of Internal Revenue* v. *Modjeski* (75 F. [2d] 468). In that case Dr. Modjeski, an eminent consulting engineer in the employ of the Delaware River Joint Commission in connection with the construction of a bridge over the Delaware river, sought exemption of his salary from Federal income taxation. The court, while discussing the question of " essential governmental functions " and " usual governmental functions," based its holding on a finding that Dr. Modjeski was an independent contractor and, for that reason, subject to taxation. The court said: " Whether the Commission was a governmental agency engaged in the exercise of a

usual governmental function or merely carrying on the ministerial or proprietary functions for inhabitants of the interested States, we need not decide."

The question whether the creation of port facilities, the building of bridges, highways and tunnels were essential or usual governmental functions, which was avoided in the *Modjeski Case (supra)*, was squarely presented and decided by the same court in *Commissioner of Internal Revenue* v. *Ten Eyck* (76 F. [2d] 515), a case involving the Federal taxation of the salary of the chairman of the Albany Port District Commission. The court reviewed in detail the creation, the powers and the activities of the Commission. If found that the construction of port and harbor or terminal developments and facilities were, classically and historically, governmental functions, usually conducted by governmental agencies. The court said: " The Commission, in the instant case, a public corporation, maintaining and operating a public port, not for profit, is performing a usual governmental function, and is not withdrawing sources of revenue from the Federal taxing power. It has supplanted no private business to which the Federal taxing power would normally extend. If a private corporation performs public services for a profit, it cannot be said to be exercising governmental functions simply because of that service."

The court reviewed the United States Supreme Court decisions in the State liquor dispensary cases (*Ohio* v. *Helvering, supra,* and *South Carolina* v. *United States, supra*) and said: " It is the entrance into a trade enterprise that distinguishes these cases, relied upon by the petitioner [Commissioner of Internal Revenue]. It cannot be maintained that there is involved in the instant case a trade or business, entered into for profit, constituting a proprietary enterprise. Revenues are not profits, but revenues, like tolls collected from users of a State improvement, are merely means by which the State attempts to recoup in some part its legitimate expenses." The court affirmed the ruling of the United States Board of Tax Appeals that the salary of the chairman of the Albany Port District Commission was not subject to Federal taxation.

The operation of steamships, railroads, stores, hotels or dairies has not the slightest relationship to any governmental function. Common sense compels the conclusion that such activities are intrinsically, traditionally and historically of a commercial and proprietary nature. And this is further reinforced when it is considered that the particular activities here in question have a background of fifty-five years of private, commercial operation. As Mr. Justice DAY said in *Flint* v. *Stone Tracy Co.* (*supra*, 172), It is no part of the essential governmental functions of a State to provide means of transportation.

It seems clear to us that the Panama Railroad Company is a government-controlled corporate agency engaged in a commercial proprietary function. This case must be decided upon the principles laid down in *South Carolina* v. *United States (supra)*, *Ohio* v. *Helvering (supra)* and *Helvering* v. *Powers (supra)*. Assuredly, the ownership and operation of stores, hotels and dairies is akin to the operation of liquor stores; and the operation of a steamship line and a railroad comparable to the operation of a street railway. And this particularly where such operation is in continuation and expansion of earlier private commercial operation. The commercial nature of the functions of the Panama Railroad Company are further marked by the fact that its operations are profitable and yield dividends to its stockholder, the United States. These operations constitute an activity to which, unquestionably, the taxing power of the State would normally extend. Under the decision in *Helvering* v. *Powers (supra)* the Federal government cannot withdraw sources of revenues from a State by engaging in a business which constitutes a departure from usual governmental functions and to which the State's taxing power would normally extend.

The mutual and complementary immunity from taxation of State and Federal instrumentalities of government is implicit in our constitutional form of government and is founded in the doctrine that power to tax is power to destroy. (*McCulloch* v. *State of Maryland, supra*.)

It seems apparent that the principle of immunity, interfering as it does with the exercise of a vitally important, plenary sovereign power, ought only to be invoked and employed when there is a direct and imminent hindrance to, or restraint upon, functions which are unquestionably properly and usually governmental in their character. Otherwise little will remain beyond an ever-dwindling semblance of State sovereignty, if immunity from State taxation is sought and allowed in the case of all of the constantly broadening activities of the Federal government.

The determination of the State Tax Commission should be confirmed, with fifty dollars costs.

HILL, P. J., RHODES, McNAMEE and CRAPSER, JJ., concur.

Determination confirmed, with fifty dollars costs and disbursements.