# NEW YORK EX REL. ROGERS v. GRAVES ET AL.

No. 139.   Argued December 9, 10, 1936.—Decided January 4, 1937.

*Mr. Richard Reid Rogers* for appellant.

*Mr. Joseph M. Mesnig,* Assistant Attorney General of New York, with whom *Mr. John J. Bennett, Jr.,* Attorney General, and *Mr. Henry Epstein,* Solicitor General, were on the brief, for appellees.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

The relator, Richard Reid Rogers, is general counsel for the Panama Rail Road Company, a corporation created by an old statute of the State of New York for the purpose of constructing and operating a railroad across the Isthmus of Panama. In making his state income-tax return for the years 1927, 1928, and 1929, he reported the receipt of salary from the corporation during those years, but, upon the claim that the salary was exempt, paid no tax. The State Tax Commission, however, sustained the tax, and it then was paid under protest. The Appellate Division of the Supreme Court of New York, to which the case was taken by certiorari, upheld the view of the Tax Commission, 245 App. Div. 452; 283 N. Y. S. 538, and the decision was affirmed by the Court of Appeals, without opinion. 271 N. Y. 543; 2 N. E. (2d) 686.

The ground upon which the relator claimed the exemption was that the Panama Rail Road Company was a

wholly-owned instrumentality of the United States, engaged in maintaining, operating and protecting the Panama Canal; that as such, the railroad company was exempt from state taxation and, in consequence, the fixed salaries paid to its officers and employees were also exempt. The Appellate Division held that the railroad company was a government-controlled corporate agency engaged in a commercial proprietary function, and was not immune from state taxation since, it said, such taxation did not hinder or restrain "functions which are unquestionably, properly and usually governmental in their character."

*First.* The corporation was privately owned and operated for many years; but in 1904, the United States acquired the entire capital stock of the corporation, and ever since has been, and now is, the sole owner thereof. The company operates a railroad across the Isthmus, conducts a commissary establishment for the benefit of the personnel of the Panama Canal, the railroad company, and the armed forces of the United States upon the Isthmus, and operates a dairy and two hotels in connection therewith. It also operates a line of steamships between New York and the Canal Zone, which ships afford the personnel of the canal and of the railroad company transportation at a nominal rate, and carry freight for the government of the United States to the Canal Zone at 25% less than the customary tariff rates.

The acquisition by the United States of the Panama Rail Road Company was coincident with its acquisition of the control of the Panama Canal Zone and the right to construct and maintain a ship canal across it. Since the acquisition of the railroad company by the government, the directors, thirteen in number, have been elected by the Secretary of War, as sole stockholder of record of the corporate stock with the exception of thirteen qualifying shares held by the directors.

During the construction of the canal, the railroad was almost exclusively employed as an adjunct of such construction, although it was incidentally used also for commercial transportation across the Isthmus. In *United States ex rel. Skinner & Eddy Corp.* v. *McCarl,* 275 U. S. 1, 6, we said, "For many years before the War, the Government had employed the Panama Railroad Company as its instrumentality in connection with the Canal." In a footnote following that statement, we pointed out that the stock in the railroad company was acquired in order that the railroad might be used in the manner most helpful to the government in constructing the canal, and cited public documents which sustained that view.

In order to reach a correct determination of the question whether the railroad company is exercising functions of a governmental character, the railroad and ships are to be considered not as things apart, but in their relation to the Panama Canal; and it is clear that the railroad and ships, after the completion of the canal, continued to be used chiefly as adjuncts to its management and operation. The question, therefore, to be answered is whether the canal is such an instrumentality of the federal government as to be immune from state taxation; and, if so, are the operations of the railroad company so connected with the canal as to confer upon the company a like immunity?

The authority for the construction of the canal and the acquisition of rights in connection therewith is found in the Act of Congress of June 28, 1902, c. 1302, 32 Stat. 481. By that act, the President was authorized to acquire for the United States all the rights and property of the New Panama Canal Company, of France, on the Isthmus of Panama, including the capital stock of the Panama Rail Road Company "owned by or held for the use of said canal company"; to acquire from the Republic of Colombia perpetual control of the Panama Canal Zone, a strip of land six miles in width and extending across the Isth-

mus; and to construct and perpetually maintain, operate, and protect thereon a ship canal, including "the right to perpetually maintain and operate the Panama Railroad." The acquisition was to include jurisdiction over the Zone and the ports at the ends thereof, and the power to make police and sanitary rules and regulations necessary to preserve order and preserve the public health thereon; and to establish judicial tribunals necessary to enforce such rules and regulations.

Section 7 of the act created a commission to carry out the purpose of the act, and authorized the employment of engineers necessary for the prosecution of the work. The commission was to be subject to the direction and control of the President, and was to make full reports of their doings, to be transmitted to Congress by the President. Section 8 authorized the Secretary of the Treasury to borrow, on the credit of the United States, such sums as might be required to defray expenditures authorized by the act, not to exceed $130,000,000, and to issue bonds of the United States as security therefor.

The Act of August 24, 1912, c. 390, § 4, 37 Stat. 560, 561; 48 U. S. C. § 1305, authorized the President to govern and operate the Panama Canal and the Canal Zone through a Governor of the "Panama Canal" and other persons. The Governor was to be appointed by and with the advice and consent of the Senate, commissioned for a term of four years, with an annual salary of $10,000. The Governor was to have control and jurisdiction over the Zone, which was to be held, treated and governed as an adjunct of the canal. 37 Stat. 564, § 7; 48 U. S. C. § 1307. Later legislation authorizes the President to make rules and regulations in matters of health, etc., and imposes penalties for their violation. 48 U. S. C. § 1310. The President is also given broad powers of police within the Zone. 48 U. S. C. §§ 1312, 1313, 1314. We need not particularize further. Chapter 6, Title 48 U. S. C., dis-

closes a large body of laws passed by Congress for the government and control of the canal, and of both the Canal Zone and the railroad company as necessary adjuncts of the canal.

That under these laws, the creation, management and operation of the canal are all governmental functions and the laws well within the constitutional power of Congress to provide for the national defense and to regulate commerce under the commerce clause of the Constitution, does not admit of doubt. *California* v. *Central Pacific Railroad Co.,* 127 U. S. 1, 39; *Luxton* v. *North River Bridge Co.,* 153 U. S. 525.

The building and operation of a bridge or a road or a canal is not commerce in the substantive sense, but is the creation and use of a physical thing as a medium by and through which commerce is regulated, since such creation and use condition and facilitate transportation. *Luxton* v. *North River Bridge Co., supra,* pp. 533–534; *Pensacola Telegraph Co.* v. *Western Union,* 96 U. S. 1, 9, 10; cf. *Carter* v. *Carter Coal Co.,* 298 U. S. 238, 297. In recognition of the principle established by these and other decisions, this court in *Wilson* v. *Shaw,* 204 U. S. 24, 33, sustained the acquisition, construction and maintenance of the canal as within the commerce power of the federal government.

Such being the status of the canal, it requires no argument to demonstrate that all auxiliaries primarily designed and used to aid in its management and operation, and which have that effect, partake of its nature and are themselves coöperating regulators—or, perhaps more accurately speaking, constitute, with the canal, a single great regulator—of national and international commerce. And this, we think, is the effect of the interrelation of the railroad company's activities with the management and operation of the canal.

If support for this view were thought necessary, it could be found in the contemporaneous and long-

continued administrative practice. On April 27, 1928, the Secretary of War, in a letter to the President, said: "The [steamship] Line is an integral part of the Panama Canal and indispensable in its discharge of its normal responsibilities. The successful operation of this great enterprise, which is of vital importance to the United States, demands absolute security as to its line of supply to this country."

Section 500 of the War Revenue Act of 1917 (40 Stat. 314), levied a tax upon sums paid for transportation by rail and water, but exempted (§ 502) therefrom payments received for services rendered to the United States, etc. The Commissioner of Internal Revenue held that transportation services performed for the Panama Rail Road Company fell within the exemption, on the ground that they were "in substance payments for services rendered the United States."

Article 96, Department Regulations No. 49, revision of June, 1921, declares that transportation services rendered to agencies of the United States are exempt from the tax, and enumerates as among such agencies the Panama Rail Road Company. The commissioner had likewise held that the railroad company was not subject to the capital stock tax imposed by the Revenue Act of 1918 (40 Stat. 1126), because the company was a government agency. Again, on September 20, 1926, the Commissioner of Internal Revenue advised the company that inasmuch as it was a governmental agency, it was not required to file federal income-tax returns or to pay federal income taxes. No act of Congress suggests any different view, but all such legislation, so far as it deals with the subject, recognizes its correctness.

We attach no importance to the fact that the railroad company has utilized both its ships and railroad to carry private freight and passengers. The record shows that this is done to a limited extent compared with the government business; and that it is only incidental to the

governmental operations. The primary purpose of the enterprise being legitimately governmental, its incidental use for private purposes affords no ground for objection. *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53, 73; *Ashwander* v. *Tennessee Valley Authority*, 297 U. S. 288, 333. The first of these two cases dealt with the disposition of excess water power developed by a project to improve navigation; and the second with the disposition of surplus electric energy developed by a like project. But the principle is equally applicable to the situation here.

It is suggested that the dairy, hotels, and other enterprises, built and maintained by the company, are not governmental instrumentalities. Even if we accept that conclusion—which, in view of their use for the personnel of the railroad and canal, we are far from doing—it would not alter the fact that the railroad itself, in connection with the canal, is a federal instrumentality.

*Second.* The power of the federal government to use a corporation as a means to carry into effect the substantive powers granted by the Constitution has never been doubted since *McCulloch* v. *Maryland*, 4 Wheat. 316. The Panama Rail Road Company was acquired and has been utilized in virtue of that power. The railroad company being immune from state taxation, it necessarily results that fixed salaries and compensation paid to its officers and employees in their capacity as such are likewise immune.

In *Dobbins* v. *Commissioners of Erie County*, 16 Pet. 435, 448–449, this court held that a state was without authority to tax the instruments, or compensation of persons, which the United States may use and employ as necessary and proper means to execute its sovereign power. The rule is well established; and the reasons upon which it is based and the authorities sustaining it have been so recently reviewed by this Court, *Indian*

*Motocycle Co.* v. *United States,* 283 U. S. 570, 575, *et seq.,* that further discussion is unnecessary.

The rule itself is not denied; but it was suggested in the court below by counsel for the state, and the suggestion was repeated here, albeit faintly, that the record does not establish whether relator was an officer or employee of the railroad company or an independent contractor. The point was not made or suggested either before the State Tax Commission or in the Appellate Division of the Supreme Court. The whole question there was whether the company was subject to taxation; and it quite evidently was taken for granted that a negative answer to that question would carry with it an exemption of relator's salary. It is conceded that the point was raised by counsel for the state for the first time in the Court of Appeals; and that in reply to a question from that bench whether he wished the case decided upon that point, counsel answered in the negative and declared that the state wanted a decision upon the merits.

Under these circumstances, it is not surprising that the obligation of the relator to prove his case in this regard was somewhat perfunctorily discharged. The record, however, does show that relator was, and had been ever since the year 1906, general counsel for the railroad company with a fixed annual salary, in the same category in respect of the railroad company as the secretary and treasurer. We think this evidence sufficiently negatives the belated suggestion that relator may have been an independent contractor and not an officer, within the rule stated and discussed in *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514, 524–526.

> *Reversed and remanded for further proceedings not inconsistent with this opinion.*

Mr. Justice Stone took no part in the consideration or decision of this case.