**Patricia McGEHEE, wife of/and W.R. McGehee, Plaintiffs–Appellees,**

v.

**The PANAMA CANAL COMMISSION**

and

**S/S TEXACO KENTUCKY, in rem, Defendants–Appellants.**

No. 88–3230.

United States Court of Appeals, Fifth Circuit.

May 19, 1989.

Cynthia J. Thomas, Francis M. Kirk, Panama Canal Com'n, Office of General Counsel, Miami, Fla., for defendants-appellants.

Andrew C. Wilson, Daniel E. Knowles, III, New Orleans, La., for plaintiffs-appellees.

Before REAVLEY, POLITZ and SMITH, Circuit Judges.

POLITZ, Circuit Judge:

The sole question posed by this appeal is whether the district court erred in awarding interest to Patricia and W.R. McGehee on their judgment against the Panama Canal Commission. Concluding that interest should not have been awarded, we reverse.

### Background

On July 26, 1982, the TEXACO KENTUCKY, a tanker under the control of a

---

Panama Canal Commission pilot, crashed into a pier in Cristobal, Republic of Panama, and damaged several yachts, including the S/K MATANG, a sailing ketch owned by the McGehees. The collision occurred outside the locks of the Panama Canal. The Commission's Board of Local Inspectors conducted a prompt inquiry and concluded that the Commission's employee was at fault and that the Commission was responsible. The Commission attempted to adjust the claim pursuant to section 1412 of the Panama Canal Act of 1979,[1] but the parties could not agree on a settlement figure. The McGehees' demand exceeded $120,000 and the Commission reported the claim to Congress, as then required by sections 1412 and 1415 of the Act.

In 1985 Congress amended section 1416 of the Act[2] to permit an aggrieved party to sue the Commission in the United States District Court for the Eastern District of Louisiana.[3] The McGehees did so. Liabili-

ty was stipulated; damages were contested. The district court awarded the McGehees $93,900 for property damage, the cost of transporting the ketch, living expenses during the repair period, and other miscellaneous expenses. The court also awarded 8½ prejudgment interest from date of the casualty to date of judgment, and thereafter postjudgment interest at the legal rate. The government appeals.

## Analysis

We begin with the general proposition that sovereign immunity bars an award of interest against the United States. *Perez v. United States*, 830 F.2d 54 (5th Cir. 1987). The rule admits of exceptions, two of which are relevant in this case.[4] The United States may be ordered to pay interest when Congress has expressly consented to such an award, *Library of Congress v. Shaw*, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986), and when Congress has

---

1. At the time, section 1412 provided in relevant part:

 **Injuries outside locks**

 The Commission shall promptly adjust and pay damages for injuries to vessels, or to the cargo, crew, or passengers of vessels which may arise by reason of their presence in the Panama Canal, or waters adjacent thereto, other than the locks, when the injury was proximately caused by negligence or fault on the part of an officer or employee. of the United States acting within the scope of his employment and in the line of his duties in connection with the operation of the Canal, and when the amount of the claim does not exceed $120,000. Panama Canal Act of 1979, Pub.L. No. 96–70, § 1412, 93 Stat. 485.

2. Section 1416, 22 U.S.C. § 3776, as amended, provides:

 **Actions on claims**

 A claimant for damages pursuant to section 1411(a) or 1412 of this Act who considers himself aggrieved by the findings, determination, or award of the Commission in reference to his claim may bring an action on the claim against the Commission in the United States District Court for the Eastern District of Louisiana. Subject to the provisions of this chapter and of applicable regulations issued pursuant to section 1801 of this Act relative to navigation of the Panama Canal and adjacent waters, such actions shall proceed and be heard by the court without a jury according to the principles of law and rules of practice obtaining generally in like cases between a private party and a department or agency of

the United States. Any judgment obtained against the Commission in an action under this subchapter may be paid only out of money appropriated or allotted for the maintenance and operation of the Panama Canal. An action for damages cognizable under this section shall not otherwise lie against the United States or the Commission, nor in any other court, than as provided in this section; nor may it lie against any officer or employee of the United States or of the Commission. Any action on a claim under this section shall be barred unless the action is brought within one year after the date on which the Commission mails to the claimant written notification of the Commission's final determination with respect to the claim, or within one year after the date of the enactment of the Panama Canal Amendments Act of 1985, whichever is later. Attorneys appointed by the Commission shall represent the Commission in any action arising under this subchapter.

3. The 1985 amendments also gave the Commission authority to adjust section 1412 claims exceeding $120,000 and repealed section 1415's requirement of submission of claims exceeding $120,000 to Congress. *See* 22 U.S.C. §§ 3772, 3775.

4. Other exceptions include waiver of immunity by contract and takings under the fifth amendment, where just compensation includes a payment for interest. *See Library of Congress v. Shaw*, 478 U.S. 310, 317 & n. 5, 106 S.Ct. 2957, 2963 & n. 5, 92 L.Ed.2d 250 (1986).

shed the cloak of sovereignty and given an agency the status of a commercial operation, *Loeffler v. Frank,* — U.S. —, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988). The focus of the first exception is whether the legislation giving rise to the cause of action expressly subjects the government to interest payments. The second exception turns on whether Congress, in creating the agency, intended a waiver of immunity from interest awards. In the case at bar, the statutory scheme giving rise to the McGehees' cause of action—the Panama Canal Act of 1979, implementing the Panama Canal Treaty of 1977, T.I.A.S. No. 10030—also creates the agency involved, the Panama Canal Commission.[5]

### 1. Express waiver

In *Library of Congress v. Shaw,* the Supreme Court considered whether Congress had expressly waived interest immunity when it enacted section 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k). In discussing the issue, the Court observed:

> This basic rule of sovereign immunity, in conjunction with the requirement of an agreement to pay interest, gave rise to the rule that interest cannot be recovered unless the award of interest was affirmatively and separately contemplated by Congress. See, e.g., *United States ex rel. Angarica v. Bayard,* 127 U.S. 251, 260 [8 S.Ct. 1156, 1161, 32 L.Ed. 159] (1888) ("The case, therefore, falls within the well-settled principle, that the United States is not liable to pay interest on claims against them, in the absence of express statutory provision to that effect"). The purpose of the rule is to permit the Government to "occupy an apparently favored position," *United States v. Verdier,* 164 U.S. 213, 219 [17

S.Ct. 42, 44, 41 L.Ed. 407] (1896), by protecting it from claims for interest that would prevail against private parties. See 4 Op.Atty.Gen. 136, 137 (1842).

> For well over a century, this Court, executive agencies, and Congress itself consistently have recognized that federal statutes cannot be read to permit interest to run on a recovery against the United States unless Congress affirmatively mandates that result.

*Shaw,* 478 U.S. at 315–16, 106 S.Ct. at 2962–63.

The Court concluded that section 706(k), which renders the government liable "the same as a private person" for costs and attorneys' fees in a Title VII action, does not contain an express waiver of immunity from interest payments. In making that determination, the Court stated:

> In analyzing whether Congress has waived the immunity of the United States, we must construe waivers strictly in favor of the sovereign, see *McMahon v. United States,* 342 U.S. 25, 27 [72 S.Ct. 17, 19, 96 L.Ed. 26] (1951), and not enlarge the waiver " 'beyond what the language requires,' " *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 685–686 [103 S.Ct. 3274, 3277–78, 77 L.Ed.2d 938] (1983), quoting *Eastern Transportation Co. v. United States,* 272 U.S. 675, 686 [47 S.Ct. 289, 291, 71 L.Ed. 472] (1927). The no-interest rule provides an added gloss of strictness upon these usual rules.

*Shaw,* 478 U.S. at 318, 106 S.Ct. at 2963.

The McGehees' suit against the Panama Canal Commission was brought under section 1416 of the Panama Canal Act of 1979, which contains no reference to an award of interest.[6] Section 1413 of the Act[7] pro-

---

**5.** Compare, however, *Loeffler v. Frank,* — U.S. —, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988), where the legislation giving rise to Loeffler's suit against the United States Postal Service was Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* while the legislation empowering the United States Postal Service was the Postal Reorganization Act, 39 U.S.C. § 401.

**6.** *See supra* note 2.

**7.** Section 1413, 22 U.S.C. § 3773, provides in relevant part:

**Measure of damages generally**

In determining the amount of the award of damages for injuries to a vessel for which the Commission is determined to be liable, there may be included—

(1) the actual or estimated cost of repairs;

(2) charter hire actually lost by the owners, or charter hire actually paid, depending

vides the measure of damages "for injuries to a vessel for which the Commission is determined to be liable." In adopting section 1413, Congress reenacted almost verbatim the provisions of section 293 of the Canal Zone Code, legislation ordained pursuant to the Panama Canal Treaty of 1903. In *Gulf Oil Corp. v. Panama Canal Co.*, 481 F.2d 561, 569 (5th Cir.1973) (*Gulfspray III*), we held that section 293 provided for "a recovery of damages substantially parallel to that accorded by the general maritime law." In addition to discussing a number of damages recoverable under section 293, we concluded that the Panama Canal Company was liable for prejudgment interest.

Congress cited *Gulfspray III* in the House Report accompanying H.R. 111, the bill that eventually became the 1979 Act. Specifically, in explaining the scope of a provision that became section 1416, the House Report states:

> *Measure of damages generally.*—This section would reenact the provisions of paragraph (c) of 2 C.Z. Code 293....
>
> This section has been construed by the U.S. Court of Appeals for the 5th Circuit as establishing rules for recovery of damages substantially parallel to that accorded by general maritime law. *Gulf Oil Corp. v. Panama Canal Company*, 481 F.2d 561 (5th Cir.1973).

H.R.Rep. No. 98, 96th Cong., 1st Sess. 65–66, *reprinted in* 1979 U.S.Code Cong. & Admin.News 1034, 1068.

The McGehees refer to this portion of the legislative history and to *Gulfspray III* as authority for the proposition that there exists express congressional consent to an award of interest. To accept this proposition we would have to assume that in enacting section 293 Congress impliedly waived immunity from interest vulnerability,[8] an assumption which is impermissible after *Shaw*. Nor is the reference to *Gulfspray III* in the legislative history sufficient to carry the day. Several items of damages were at issue in that case. We are not persuaded that the general legislative reference may be taken as specifically blessing over the interest award.[9] Even if Congress so intended, such intent would not cross the *Shaw* threshold:

> "[T]here can be no consent by implication or by use of ambiguous language. Nor can an intent on the part of the framers of a statute or contract to permit the recovery of interest suffice where the intent is not translated into affirmative statutory or contractual terms. The consent necessary to waive the traditional immunity must be express, and it must be strictly construed."

*Shaw*, 478 U.S. at 318, 106 S.Ct. at 2963 (quoting *United States v. N.Y. Rayon Importing Co.*, 329 U.S. 654, 659, 67 S.Ct. 601, 604, 91 L.Ed. 577 (1947)).

Absent express statutory consent to an

---

upon the terms of the charter party, for the time the vessel is undergoing repairs;

(3) maintenance of the vessel and wages of the crew, if they are found to be actual additional expenses or losses incurred outside of the charter hire; and

(4) other expenses which are definitely and accurately shown to have been incurred necessarily and by reason of the accident or injuries.

Agent's fees, or commissions, or other incidental expenses of similar character, or any items which are indefinite, indeterminable, speculative, or conjectural may not be allowed.

**8.** The award of interest in *Gulfspray III* necessarily was based on the commercial nature of the Panama Canal Company. Otherwise, it could not be reconciled with the teachings of

*Boston Sand and Gravel Co. v. United States*, 278 U.S. 41, 46, 49 S.Ct. 52, 53, 73 L.Ed. 170 (1928). That case informs that Congress had not waived the government's interest immunity in enacting the Act of May 15, 1922, 42 Stat. 1590, which, in cases arising from a collision between a United States warship and a private vessel, authorized the district court to award "'the amount of the legal damages sustained by reason of said collision ... upon the same principle and measure of liability with costs as in like cases in admiralty between private parties with the same rights of appeal.'"

**9.** The entity in *Gulfspray III* was the Panama Canal Company. When Congress referred to *Gulfspray III* it was aware that the Panama Canal Company had been abolished by the 1977 treaty and that the replacement Commission differed markedly.

award of interest,[10] we conclude, as did the court *a quo*, that interest cannot be assessed against the Commission on the basis of the express-waiver exception to the no-interest rule.

## 2. Commercial enterprise

In allowing interest on a judgment ordering payment under insurance policies issued by the United States, the Court opined in *Standard Oil Co. v. United States*, 267 U.S. 76, 79, 45 S.Ct. 211, 212, 69 L.Ed. 519 (1925):

> When the United States went into the insurance business, issued policies in familiar form and provided that in case of disagreement it might be sued, it must be assumed to have accepted the ordinary incidents of suits in such business.

Three score years later in *Shaw*, the Court cited *Standard Oil*, observing:

> The no-interest rule is similarly inapplicable where the Government has cast off the cloak of sovereignty and assumed the status of a private commercial enterprise.

*Shaw*, 478 U.S. at 317 n. 5, 106 S.Ct. at 2963 n. 5. While merely dicta in *Shaw*, the commercial-enterprise exception to the no-interest rule served as the basis for an award of interest against the United States Postal Service in *Loeffler v. Frank*. Loeffler sued the Postal Service under Title VII and won reinstatement with back pay. The trial court and court of appeals declined to award interest. The Supreme Court reversed, concluding that section 401 of the Postal Reorganization Act provided a waiver of sovereign immunity from interest awards against the Postal Service.[11]

Central to the Court's conclusion that the agency's interest immunity had been waived was the fact that Congress had empowered it to sue and be sued. The Court noted:

> Congress ... has waived the sovereign immunity of certain federal entities from the times of their inception by including in the enabling legislation provisions that they may sue and be sued. In *FHA v. Burr*, 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940), the Court explained:
>
> > "[S]uch waivers by Congress of governmental immunity ... should be liberally construed.... Hence, when Congress establishes such an agency, authorizes it to engage in commercial and business transactions with the public, and permits it to 'sue and be sued,' it cannot be lightly assumed that restrictions on that authority are to be implied ... In the absence of [a clear showing that certain suits are not consistent with the statutory or constitutional scheme], it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue and be sued,' that agency is not less amenable to judicial process than a private enterprise under like circumstances would be." (Footnote omitted.)

Encompassed within this liberal-construction rule is the principle "that the words 'sue and be sued' normally include the natural and appropriate incidents of legal proceedings." [*Reconstruction Finance Corp. v.*] *J.G. Menihan Corp.*, 312 U.S. [81] at 85 [61 S.Ct. 485 at 487, 85 L.Ed. 595 (1941)].

*Loeffler*, —— U.S. at —— ——, 108 S.Ct. at 1969, 100 L.Ed.2d at 556–57 (some citations omitted).

---

**10.** In *Shaw*, 478 U.S. at 318, 106 S.Ct. at 2963, the Court noted that "[w]hen Congress has intended to waive the United States' immunity with respect to interest, it has done so expressly." To underscore this point the Court cited several statutes that include express congressional waivers of the government's interest immunity: "28 U.S.C. § 2411 (expressly authorizing prejudgment and post-judgment interest payable by the United States in tax-refund cases); 31 U.S.C. § 1304 (appropriating funds for interest on certain district court judgments);

26 U.S.C. § 7426(g) (providing for interest in cases of wrongful levy by Internal Revenue Service)." 478 U.S. at 318 n. 6, 106 S.Ct. at 2963 n. 6.

**11.** Having so concluded, the *Loeffler* court found it unnecessary to "search for an express waiver of immunity from interest within Title VII," as it had in *Shaw*. *Loeffler*, —— U.S. at ——, 108 S.Ct. at 1974, 100 L.Ed.2d at 563.

In establishing the Panama Canal Commission,[12] Congress did not enable it to sue and be sued. The McGehees acknowledge this fact and the holding in *Loeffler*, but maintain that the words "sue and be sued" are not talismanic. They contend that when the government enters the business world, as they claim it has in this case, its interest immunity is waived despite the absence of a sue-and-be-sued clause.[13] Assuming *per arguendo* that a sue-and-be-sued clause is not essential,[14] we conclude that an award of interest against the Commission would be inappropriate because the Commission does not operate as a commercial venture.[15]

The Panama Canal Treaty of 1977 grants the United States the right to manage, operate, and maintain the Panama Canal, responsibilities to be exercised by the Panama Canal Commission. The annex to the treaty lists certain functions to be performed by the Commission, most of which are not of a commercial nature, together with certain activities the Commission may not do, most of which are of a commercial nature. (See Appendix.)

In addition to the language of the treaty and implementing statutes, we find further support for the conclusion that the Commission is not a commercial operation in the legislative history. In deciding the appropriate form for the Commission, Congress considered a continuation of the corporate form of the predecessor Panama Canal Company, but that idea was rejected.[16] The legislative history of H.R. 111, which eventually became the 1979 Act, tells why:

> Now, under the 1977 treaty, substantially all the collateral revenue-producing business activities of the corporation are to be transferred to Panama; private business is to be introduced into the area that had been the Canal Zone; and the sole remaining mission of the Panama Canal Commission is to be limited to the operation of the canal.

**12.** Section 1101 of the 1979 Act, 22 U.S.C. § 3611, provides in pertinent part:
There is established in the executive branch of the United States Government an agency to be known as the Panama Canal Commission.... The Commission shall, under the general supervision of the Board established by section 1102 of this Act, be responsible for the maintenance and operation of the Panama Canal and the facilities and appurtenances related thereto.

**13.** Although we have held that the *presence* of a sue-and-be-sued clause does not automatically result in a waiver of the United States' interest immunity, *see A.L.T. Corp. v. Small Business Admin.*, 823 F.2d 126 (5th Cir.1987); *R & R Farm Enter., Inc. v. Federal Crop Ins. Corp.*, 788 F.2d 1148 (5th Cir.1986), we are aware of no case in this or any other circuit in which a court has awarded interest against a government entity that is not empowered "to sue and be sued," excepting, of course, those cases in which the express-waiver exception to the no-interest rule was found applicable.

**14.** Without deciding the issue, we note that in *Loeffler* the Court observed that because the Library of Congress is not a " 'sue-and-be-sued' agency" that has been " 'launched ... into the commercial world,' " the *Shaw* Court did not examine whether interest could be awarded against the Library on what we refer to as the commercial-enterprise exception to the no-interest rule. *See Loeffler*, —— U.S. at ——, 108 S.Ct. at 1974, 100 L.Ed.2d at 563.

**15.** In *Gulf Oil Corp. v. Panama Canal Co.*, 407 F.2d 24 (5th Cir.1969) (*Gulfspray I*), we held that in granting the Panama Canal Company the power to sue and be sued and placing it in charge of all business operations in the Canal Zone, Congress waived the Company's sovereign immunity. In *Gulfspray III*, we concluded that interest could be awarded against the Company. The 1903 Treaty, under which the Panama Canal Company operated, was replaced by the Treaty of 1977. The 1977 Treaty and implementing legislation created the Commission, vesting it with power to perform a range of duties in the exercise of the rights of the United States with respect to management, operation, and maintenance of the Panama Canal. However, the Commission is not empowered to perform many commercial activities previously performed by the Panama Canal Company. As a consequence of these marked changes in the structure and functions of the Commission, in light of the teachings of *Shaw* and *Loeffler*, we conclude that *Gulfspray III* has little applicability to the issue at bar.

**16.** The Senate counterpart to H.R. 111 proposed establishing the Commission in corporate form. Although that bill would have given the Commission power to sue and be sued, it included an express exemption from liability for prejudgment interest. S.Rep. No. 255, 96th Cong., 1st Sess. (1979).

Despite the fact that the canal generates revenue, the purpose of the canal is not commercial but governmental, and the criteria that are used in the selection of the corporate form for a government agency conducting business operations ... simply do not apply.

.　　.　　.　　.　　.

A second consideration involved ... is whether the mission of the agency is, in fact, to carry on a business or to perform a governmental function. The Supreme Court has expressly held that the operation of the canal is a governmental exercise of the power of Congress to regulate commerce, rather than a proprietary or business activity of the Government. [See *Rogers v. Graves*, 299 U.S. 401, 57 S.Ct. 269, 81 L.Ed. 306 (1937).]

*Canal Operation Under 1977 Treaty: Hearings on H.R. 111, H.R. 454, H.R. 1511, H.R. 1716, H.R. 1958, H.R. 2522 Before the Subcomm. on Merchant Marine and Fisheries*, 96th Cong., 1st Sess. 96–1 (1979) (statement of Rep. Murphy).

The Commission was not created to perform a commercial function. Accordingly, it is not subject to the commercial-enterprise exception to the no-interest rule.

The award of interest is REVERSED.

### APPENDIX

### ANNEX

*Procedures for the Cessation or Transfer of Activities Carried out by the Panama Canal Company and the Canal Zone Government and Illustrative List of the Functions that may be Performed by the Panama Canal Commission*

\*　　\*　　\*

3. It is understood that the Panama Canal Commission, in the exercise of the rights of the United States of America with respect to the management, operation and maintenance of the Canal, may perform functions such as are set forth below by way of illustration:

   a. Management of the Canal enterprise.

   b. Aids to navigation in Canal waters and in proximity thereto.

   c. Control of vessel movement.

   d. Operation and maintenance of the locks.

   e. Tug service for the transit of vessels and dredging for the piers and docks of the Panama Canal Commission.

   f. Control of the water levels in Gatun, Alajuela (Madden) and Miraflores Lakes.

   g. Non-commercial transportation services in Canal waters.

   h. Meteorological and hydrographic services.

   i. Admeasurement.

   j. Non-commercial motor transport and maintenance.

   k. Industrial security through the use of watchmen.

   l. Procurement and warehousing.

   m. Telecommunications.

   n. Protection of the environment by preventing and controlling the spillage of oil and substances harmful to human or animal life and of the ecological equilibrium in areas used in operation of the Canal and the anchorages.

   o. Non-commercial vessel repair.

   p. Air conditioning services in Canal installations.

   q. Industrial sanitation and health services.

   r. Engineering design, construction and maintenance of Panama Canal Commission installations.

   s. Dredging of the Canal channel, terminal ports and adjacent waters.

   t. Control of the banks and stabilizing of the slopes of the Canal.

   u. Non-commercial handling of cargo on the piers and docks of the Panama Canal Commission.

   v. Maintenance of public areas of the Panama Canal Commission, such as parks and gardens.

   w. Generation of electric power.

   x. Purification and supply of water.

   y. Marine salvage in Canal waters.

z. Such other functions as may be necessary or appropriate to carry out, in conformity with this Treaty and related agreements, the rights and responsibilities of the United States of America with respect to the management, operation and maintenance of the Panama Canal.

4. The following activities and operations carried out by the Panama Canal Company and the Canal Zone Government shall not be carried out by the Panama Canal Commission, effective upon the dates indicated herein:

a. Upon the date of entry into force of this Treaty:

(i) Wholesale and retail sales, including those through commissaries, food stores, department stores, optical shops and pastry shops;

(ii) The production of food and drink, including milk products and bakery products;

(iii) The operation of public restaurants and cafeterias and the sale of articles through vending machines;

(iv) The operation of movie theatres, bowling alleys, pool rooms and other recreational and amusement facilities for the use of which a charge is payable;

(v) The operation of laundry and dry cleaning plants other than those operated for official use;

(vi) The repair and service of privately owned automobiles or the sale of petroleum or lubricants, including the operation of gasoline stations, repair garages and tire repair and recapping facilities, and the repair and service of other privately owned property, including appliances, electronic devices, boats, motors, and furniture;

(vii) The operation of cold storage and freezer plants other than those operated for official use;

(viii) The operation of freight houses other than those operated for official use;

(ix) Commercial services to and supply of privately owned and operated vessels, including the construction of vessels, the sale of petroleum and lubricants and the provision of water, tug services not related to the Canal or other United States Government operations, and repair of such vessels, except in situations where repairs may be necessary to remove disabled vessels from the Canal;

(x) Printing services other than for official use;

(xi) Maritime transportation for the use of the general public;

(xii) Health and medical services provided to individuals, including hospitals, leprosariums, veterinary, mortuary and cemetery services;

(xiii) Educational services not for professional training, including schools and libraries;

(xiv) Postal services;

(xv) Immigration, customs and quarantine controls, except those measures necessary to ensure the sanitation of the Canal;

(xvi) Commercial pier and dock services, such as the handling of cargo and passengers; and

(xvii) Any other commercial activity of a similar nature, not related to the management, operation or maintenance of the Canal.

b. Within thirty calendar months from the date of entry into force of this Treaty, governmental services such as:

(i) Police;

(ii) Courts; and

(iii) Prison systems.

Panama Canal Treaty, September 7, 1977, United States–Panama, annex, T.I.A.S. No. 10030.